UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

| | | |
|---|---|---|
| PREPARED FOOD PHOTOS, INC., f/k/a ADLIFE MARKETING & COMMUNICATIONS CO., INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 6:24-cv-00351-RRS-DGA |
| CLYDE'S CHICKEN KING, INC. d/b/a CHICKEN KING, | ) ) ) | |
| Defendant. | ) ) | |

**SECOND AFFIRMATION OF PAUL ALAN LEVY**

1. My name is Paul Alan Levy.  I am lead counsel for defendant.   This affirmation is made in support of its motion for an award of attorney fees and costs.

**Facts Pertaining to the Kirtsaeng Factors**

2. I have examined many although not all of the dockets in the 270 infringement lawsuits reflected in Exhibit F, attached to my first affirmation in this case.  The consistent pattern in the dockets that I reviewed was that plaintiff sued the alleged infringers in the districts where the defendants operated, not in federal court in Florida.

3. In the *Pool World* litigation discussed in my first affirmation, the spreadsheet obtained in discovery, some pages of which are attached to that affirmation as Exhibit D, contained in one of its columns the settlement amounts resulting from the threats of litigation that plaintiff's staff sent to alleged infringers.  I asked a member of the Litigation Group staff to derive the total settlements in each month. The results for the part of the year 2019 reflected on the spreadsheet are reported in the Affirmation of Martha Solt.

4. In the *Pool World* litigation, we obtained in discovery all of the subscription agreements

in which plaintiff's damages theory is based.  Not all of the subscription agreements provided for

a monthly fee of $999; some provided for significantly lower monthly payments.  I attach three such

agreements as Exhibit J (the lettering is sequential to my first Affirmation for ease of reference).

Although no protective order has ever been entered in that case, we agreed to accept the unredacted

agreements on the condition that we not publicly disclose the names of the subscribing companies.

I have redacted the names and addresses of the companies.  Each of the agreements also contains a

liquidated damages clause indicating that the value of any one photo was only $8000, not $11,992

per year.

     5.  I have spoken to several of the subscribers.  Many of them told me that their companies

had subscribed, not because they wanted access to plaintiff's database of photographs, but because

they had received threats of being sued for copyright infringement.  The subscription payments were

being made as a way of making the damages payments to which the companies had agreed in

settlement of the threatened litigation.  We served discovery in the *Pool World* case seeking to test

the bona fides of the subscription agreements (or to establish their lack of bona fides).  Plaintiff

refused to respond on relevance grounds.  When we sought to meet and confer preparatory to a

discovery motion, explaining why the discovery is relevant, plaintiff asked to stay all discovery

pending mediation of the case.  That case is currently stayed pending a mediation session next

month.

     6.  Some other subscribers told me that their subscriptions had a slightly different motivation.

During the period when plaintiff had been making its photographs available as stock photos, they

had added the photos to their own databases, but without distinguishing which photos had been taken

by plaintiff.  The subscriptions were entered, not to obtain access to plaintiff's database of photos,

-2-

but as a form of protection against mistakenly using some of plaintiff's photos that were no longer available for their use under the licenses formerly allowed.

7. I attach, as Exhibit K, a transcript of the deposition of Douglas Fleurant and an excerpt of the deposition of Rebecca Jones in the case of *Prepared Food Photos v. WeNeedaVacation.com*.

8. I have reviewed many of the complaints filed by plaintiff in the years since CopyCat Legal began to represent it. The complaint in this case closely resembles the complaints filed in many other cases. I infer that the complaint in this case was drafted by the owner of CopyCat Legal, Daniel DeSouza. After I sent a letter to Mr. DeSouza and Mr. Baay stating the amount of attorney fees we would be seeking, and asked to meet and confer in the hope of avoiding this motion, the only attorney for plaintiff in the meet-and-confer was Mr. DeSouza.

9. I received an unsolicited email directly from Joel Albrizio, plaintiff's owner, in response to my letter to plaintiff's counsel requesting agreement to attorney fees. That email is attached as Exhibit L.

10. I have reviewed many of the default judgment motions that plaintiff has filed, including the affidavits from Mr. DeSouza attesting to his hourly rate. It appears that he consistently seeks an hourly rate of $450 regardless of the district in which the case was filed. I attach several such affidavits as Exhibit M.

11. As described in footnote 2 of the summary judgment memorandum, plaintiff's default judgment motions themselves often use the "Wayback Machine" of the Internet Archive to show courts the number of years that an allegedly infringing image has been viewable on a defendant's website, using that fact to support the number of years for which the supposed lost license fee of $11,992 should be awarded.

12. I attach as Exhibit N the demand letter signed by plaintiff's lead counsel Mr. DeSouza sent to Chicken King in 2022.

**Hourly Rate**

13. I was graduated in 1976 from the University of Chicago Law School and in 1973 from Reed College.

14. I am an active member of the Bars of the District of Columbia and New York. I am admitted to practice in the United States District Courts for the District of Columbia, the Eastern District of Michigan and the Southern District of New York, in the United States Courts of Appeals for every circuit except the Federal Circuit, and in the Supreme Court of the United States. I have been admitted pro hac vice in federal and state trial and appellate courts in roughly half of the states around the country.

15. After law school, I served as a law clerk to the Honorable Wade H. McCree, Jr., of the United States Court of Appeals for the Sixth Circuit. When Judge McCree was appointed Solicitor General of the United States, I served as his Special Assistant.

16. Since December 1977, I have been employed as an attorney at Public Citizen Litigation Group. I have represented parties and argued scores of cases in the United States Courts of Appeals, including three arguments en banc, as well as many cases in state supreme and intermediate appellate court; I have also argued four cases in the Supreme Court of the United States. In addition, I was the lead author of the merits briefs in several other Supreme Court cases. I have filed many amicus briefs in the United States Supreme Court and state and federal appellate courts, and have often been permitted to argue as amicus curiae in various appellate courts as well. In the academic year 1983-84, I took a leave of absence from Public Citizen to serve as a visiting professor at Cardozo

-4-

Law School in New York.  My biographical sketch in outline form, including my publications and the cases that I have handled in the Supreme Court (including cases where I wrote the briefs but counsel who handled the case below did the oral argument), and a prose version of my resume, are attached as Exhibit O.

17.  For my first twenty-odd years at Public Citizen, I specialized in representing individual workers in cases involving union democracy, union corruption, and employees' rights of access to judicial and administrative tribunals.  However, since the turn of the century my specialty has shifted to Internet free speech cases.  My work has played a significant role in transforming the law in these areas to be more favorable for speakers whose speech the plaintiff does not like.  *See, e.g.*, Mullins, *Paul Levy: The Web Bully's Worst Enemy*, Washingtonian Magazine 29, 31 (Feb. 2014).  I believe that I have a national reputation for litigating free speech cases, especially in the online context.  My work in trademark law was recognized by the dedication of a trademark law casebook to me and one other lawyer as "two outstanding trademark lawyers who have taught and inspired us."  Ginsburg, Litman and Kevlin, *Trademark and Unfair Competition Law: Cases and Materials* v (6th ed. 2017).  In a recent case involving section 512(h) of the Digital Millennium Copyright Act, the district judge suggested that an amicus brief that I authored might have been the most helpful brief he had ever read.  Volokh, *May Be The Most Helpful Brief I've Ever Read* (May 19, 2022), available at https://reason.com/volokh/2022/05/19/may-be-the-most-helpful-brief-ive-ever-read/

18.  I have also spoken at law school, bar and other meetings in the United States and abroad including the American Intellectual Property Lawyers Association, the Intellectual Property Section of the New York State Bar Association, and a United States Copyright Office Symposium on Moral Rights.  Before the COVID pandemic. I regularly taught a self-designed CLE course entitled

Practical Considerations in Litigating Free Speech Cases.

19. Because Public Citizen is a public interest group, we generally do not bill clients for our services. Indeed, our non-profit tax status limits fees we can be paid by clients. However, we are able to seek court-awarded attorney fees at the full hourly rates set by the market for the relevant community (as the Supreme Court has allowed non-profits to do, in cases such as *Blum v. Stenson*, 465 U.S. 886 (1984)). Courts in Washington, D.C. have encouraged the use of the so-called Fitzpatrick matrix to avoid needless litigation on a case-by-case basis about the reasonable rates of counsel seeking awards of attorney fees. https://www.justice.gov/usao-dc/page/file/1504361/dl?inline. In fact, our local federal judges urged the United States Attorney's Office to create and maintain a matrix to reduce the amount of litigation over the hourly rates to be awarded for attorney fees. On the Fitzpatrick matrix, a lawyer with my level of experience would merit an hourly rate of $807 for work done in 2023.

20. In *Mick Haig Productions E.K. v. Does 1-670*, 687 F.3d 649, 650 (5th Cir. 2012), Judge Godbey of the United States District Court for the Northern District of Texas appointed me and one other lawyer as counsel ad litem to protect the interests of several hundred defendants sued in an abusive copyright case. Attorney fees were awarded at the rate of $550 per hour for my work in that case. In a trademark case, *Recouvreur v. Carreon*, 940 F. Supp.2d 1063, 1070 (N.D. Cal. 2013), the court held that the market rate for my services was $700 per hour. In *Jenzabar v Long Bow Group*, 2013 WL 5937327 (Mass. Super. Oct. 16, 2013), I sought and received an award of attorney fees at the lower hourly rate of $575 for my time. In the non-trademark case of *Smith v. Garcia*, 2017 WL 412722 (D.R.I. Jan. 31, 2017), our attorney fee demand sought an award for my time at the rate of $826 per hour; not only were fees paid at that rate, but my litigation adversary, a Miami lawyer a few

years older than I am, told me that his hourly rate was significantly higher.

21.  I was able to spend much less time on the summary judgment brief in this case than would otherwise have been needed, because I have previously prepared briefing on similar issues for other cases involving the plaintiff in this case, Prepared Food Photos.

22.  The standard practice at the Litigation Group is to have a second lawyer on every case, and to involve multiple attorneys, other than those whose names appear on the papers, in reviewing every brief and every significant item of correspondence.  That happened in this case, but no fees are being sought for the time spent by these other attorneys.

**Hours Expended**

23.  The application for fees for my services is based on my time records, as well as upon the case file.  I keep my time records for cases on spreadsheets using a program created by one of my former colleagues for this purpose, also maintained on my work computer   I generally use billing judgment in the course of recording my time, recording nothing for short conversation and reducing the amount of time recorded when it has been less efficient or productive.  I attach as Exhibit P a listing of the 63.8 hours that I had recorded on this case through May 14, printed from the time record program.

24.  After Chicken King asked me to represent it in this action, I set about finding local counsel.  My one contact in New Orleans, a firm for which I had written a Supreme Court merits brief many years ago, was unable to associate in the case, but gave me some names, neither of whom appeared to have copyright experience.  I was able to locate Heather Cross by asking my friends at the Electronic Frontier Foundation to check its referral list.  Although copyright litigation was not in her bailiwick, she was willing to be local counsel.

25.  In addition to developing the facts needed to make the various statute of limitations arguments on which defendant's motion to dismiss and for summary judgment was based, I spent time trying to obtain proof that defendant had used the chicken image pursuant to a proper license. I communicated both with the company to which AT&T had subcontracted and with a third company, based in India, with which the AT&T contractor had subcontracted.  As recounted in the affidavit of Ben Gardner, the first contractor did not have personal knowledge of the license. Because the second company did not cooperate, I was unable to obtain admissible proof of a license in time to use in the motion for summary judgment.

Pursuant to 28 U.S.C.§ 1746, I hereby certify that the foregoing is true and correct. Executed on May 15, 2024.

_____/s/ Paul Alan Levy_____
Paul Alan Levy

# Levy Second Affirmation Exhibit J

## SUBSCRIBER AGREEMENT

This End-User Subscription Agreement (the "Agreement") is by and between Adlife Marketing & Communications Company, Inc., with business offices located at 38 Church Street, Pawtucket, Rhode Island 02860 ("Adlife"), and ████████████████ with business offices located at ████████████ ████MA 02554 (the "Subscriber"). This Agreement shall be effective as of the date executed by Adlife and Subscriber ("Effective Date").  Each of Adlife and Subscriber is a "Party" and together they are the "Parties" to this Agreement.

If you are entering into this Agreement on behalf of a company or other legal entity, you represent that you have the authority to bind such entity and its affiliates to these terms and conditions. If you do not have such authority, or if you do not agree with these terms and conditions, you must not accept this Agreement and may not use the services provided under this Agreement.

Subscriber further understands that the terms of use are applicable to Subscriber's End-users, and Subscriber is responsible for (i) communication of the terms and conditions of this Agreement to all End-users and (ii) failure by the End-user to abide by the terms and conditions of this Agreement as more fully set forth herein.

Adlife has developed and maintains an Internet based subscription program allowing subscribers full access to stock photography on the website for the specific purposes of advertising subject to the conditions in this Agreement (the "Services"), provided said Subscriber is in good standing.

NOW, THEREFORE, the Parties hereto, for good and valuable consideration, the receipt, adequacy, and sufficiency of which are hereby acknowledged, and intending to be legally bound, hereby agree as follows:

1. License Grant.

    a) License to Use Service. Adlife hereby grants to Subscriber a nonexclusive, nontransferable license during the Term (the "License") to access and use the Services in accordance with this Agreement. All rights not expressly granted to Subscriber under the License are reserved by Adlife. The License granted to Subscriber pursuant to this Agreement will permit use of the Services by a number of Subscriber employees or affiliates ("End-users"), not to exceed five (5) End-users. Subscribers with greater than five (5) End-users should contact Adlife to purchase a separate Enterprise license.

    b) This license is personal to Subscriber, with no right to sub-license, distribute or make available to any other person, media or entity for any purpose.  Accordingly, Subscriber agrees not to copy, re-produce, re-sell, re-syndicate, incorporate images into a new product for resale on a one-time or syndicated basis or otherwise distribute any of the Adlife Images, by any means or method (Other than the use of the same by Subscriber in the development of custom advertising materials to a single user or entity).

    SUBSCRIBER SHALL BE RESPONSIBLE FOR THE FAILURE OF ANY SUBSCRIBER EMPLOYEE, AFFILIATE OR OTHER END-USER TO PERFORM ITS OBLIGATIONS UNDER THIS AGREEMENT. UPON TERMINATION OF THIS AGREEMENT, SUBSCRIBER

AND ITS EMPLOYEES, AFFILIATES AND END-USERS SHALL IMMEDIATELY CEASE USE OF ANY AND ALL ADLIFE IMAGES.

c)      Designated End-users. Each End-user will be designated as an End-user within the subscription Services structure. The License to use the Services by each End-user may not be shared or used by more than five (5) End-users, but may be re-issued from time to time to new End-users upon prior written notification to and acceptance by Adlife. Any unauthorized access to Services, or other abuse or impermissible activity on the Site or in connection with the Services may result in immediate suspension or termination of End-user accounts pursuant to Section 6 of this Agreement or for damages as set forth below. Subscriber will promptly notify Adlife of any unauthorized use of the Services in breach of this Agreement, any unauthorized use of accounts, or any other known or suspected breach of security.

c)      Limitations on Use. The Services are for use only by Subscriber and its assigned End-users. Except as permitted by this Agreement, the Services may not be transferred, distributed, resold, sublicensed, or used to create any derivative works. Subscriber may use the Site and Services only for its internal business purposes and shall not use the Services in association with sending spam or otherwise duplicative or unsolicited messages; use the Services in association with infringing, obscene, threatening, libelous, or otherwise unlawful or tortuous material, including material harmful to children or material in violation of third party privacy rights; or attempt to gain unauthorized access to the Site, Services, or its related systems or networks. Subscriber is responsible for ensuring that all Subscriber employees, affiliates and End-users have a copy of this Agreement and/or are advised in writing of the terms and conditions, and the penalties for breach, including without limitation termination, suspension or penalty of $8,000 per image, medium/channel of use.

2. Service Details.

The subscription plan enables the Subscriber to download vector files or JPG images (each a "Work" or "Works") of any available size. The Subscriber has the right to move a file (or files containing it) physically, but copies can be made only for back-up or archival purposes. Files downloaded from the Site may be used by the Subscriber for advertising or similar purposes as permitted by the License Agreement.

If a Work is in violation of a third-party right, Adlife may instruct Subscriber to cease all use, distribution and possession of such Work, and Subscriber must promptly comply with such instructions. Adlife reserves all rights not expressly granted in these terms.

Permitted Usage:

·      Prints, posters and other reproductions for personal use, advertising and promotional applications, including printed files, product packaging, presentations, film and video presentations, commercials, catalogues, brochures, promotional greeting cards and promotional postcards (provided they are not for resale, license or other distribution); ⬚

- Print media applications, such as books and book covers, magazines, newspapers, editorials, and newsletters;

- On–line or electronic publications, including web pages, provided, that Subscriber takes all reasonable actions to prevent website visitors from downloading or revising Work that is published on a website; or

- Any other uses approved in writing by Adlife.

Subscribers with questions as to the permitted usage of a specific file should immediately contact Adlife.

Subscriber shall not:

- Use files on products for sale, such as t-shirts, cups, posters, etc., or in places designed for the sale or promotion of such products;

- Use files or their elements as a part of a trademark or trade sign (in full or in part), a company's name, a logo, or a product's trade name;

- Post the Work online in a downloadable format;

- Use files in such a way that would allow a third party to download, transmit, distribute, or perform some other similar means of file exchange, including but not limited to the use of portable storage devices; or

- Use the Services to directly compete with Adlife or to solicit customers or accounts of Adlife.

Subscriber may use the license granted under this Agreement for the benefit of one of its clients, provided that Subscriber's client must also comply with these terms and comply with all license and use restrictions. Subscriber is solely responsible and liable for any and all use of the Work by its client. If Subscriber intends to use the same Work for the benefit of clients with more than twelve (12) locations or if Subscriber intends to use the same Work with more than twelve (12) unique clients, then Subscriber must purchase a separate Enterprise license.

Clients of Subscribers may only use licensed Works as long as the Subscriber maintains an active subscription to the Service. Upon termination, Subscriber and Subscriber's clients must discontinue use of the Works, except that clients of Subscribers may continue to distribute pre-printed stock items containing the Work or Works for a period of six months following the termination of the Subscriber's subscription.

Each client of Subscriber must be designated, in writing, to Adlife as a client of the Subscriber. Any unauthorized access to Services, or other abuse or impermissible activity on the Site or in connection with the Services may result in immediate suspension or termination of Subscriber accounts pursuant to Section 6 of this Agreement. Subscriber will promptly notify Adlife of any unauthorized use of the Services in breach of this Agreement, any unauthorized use of accounts, or any other known or suspected breach of security.

3. Adlife Proprietary Information. The Site, Services, and its Contents ("Adlife IP") are owned or licensed by Adlife and protected by U.S. and international copyright, trademark, service mark, patent and/or other proprietary rights and laws. Except as expressly provided in this Agreement, nothing contained herein shall be construed as conferring to Subscriber any license or right under copyright or other intellectual property law. No part of the Adlife IP may be altered, copied, photocopied, reproduced, translated or reduced to any electronic medium or machine- readable form, in whole or in part, except as specifically provided in this Agreement. Subscriber shall not take any action that shall interfere with or diminish Adlife's right in any of the Adlife IP.

4. Term, Suspension, and Termination.

a) Term. Unless terminated earlier pursuant to this Section 5 of this Agreement, the initial term ("Initial Term") of this Agreement shall be for a period of twelve (12) months from the Effective Date. For successive twelve-month (12) periods ("Subsequent Terms") a new agreement must be signed, unless either Party provides a thirty-day (30) written notice of termination prior to the end of each twelve-month period. The Initial Term and Subsequent Term shall together be known as the "Term". If this Agreement is continued for one or more Terms, the terms and conditions of this Agreement shall be automatically updated to be consistent with the most current End-User Subscription Agreement on the Site, without any further amendment in writing between Adlife and Subscriber. The most current End-User Subscription Agreement shall be available on the Site.

b) Suspension with Right to Cure. In addition to any other rights and remedies outlined in this Agreement, Adlife reserves the right to suspend the License and Subscriber's access to the Services upon ten (10) days' written notice to Subscriber ("Cure Period") if Subscriber's account becomes delinquent by non-payment for more than fifteen (15) days and such delinquency is not cured within the Cure Period or any other default by Subscriber hereof. Delinquent invoices are subject to interest of one percent (1.0%) per month on any outstanding balance, or the maximum permitted by law, whichever is less, plus all expenses of collection. Subscriber will continue to be charged for the remainder of the term for any delinquent accounts or for breach of this Agreement, to the extent applicable.

5. Fees and Payment.
a) Subscription Fees. The Subscription Fees are $300.00 per month, as the same may be amended from time to time, after the first twelve months following the Effective Date, at an amount equal to the then-current Preparedfoodphotos.com published rates. Payment is to be made using company credit card provided by Subscriber

b) Additional End-users. Subscriber may add End-user licenses at any time during the Initial or Subsequent Terms. Subscriber will be charged in full for any portion of a calendar month during which End-user licenses have been added. Although Subscriber may decrease End-user licenses at any time, there will be no refunds issued to Subscriber, regardless of nonpayment, nonuse, or other conduct or inaction, and all Subscription Fees will continue to be due through the end of the Initial or Subsequent Terms.

c) Enterprise Licenses. Enterprise licenses are available for Subscribers who need greater than five (5) End-user licenses or who need to use any Work for the benefit of clients with more

4

than twelve (12) locations or with more than twelve (12) unique clients. Please contact Adlife to obtain a separate Enterprise license. ⬜

d) Taxes and Duties. Adlife's fees are exclusive of all taxes, levies, or duties imposed by taxing authorities, and Subscriber will be responsible for payment of all such taxes, levies, or duties, excluding only United States (federal or state), local, or other taxes based solely on Adlife's income. ⬜

e) Exclusive, Unlicensed, and Prohibited Use. Exclusive use of Adlife photography is available at a rate starting at $8,000 per image, perchannel of use, per medium. Any unlicensed or prohibited use of any Adlife photography by Subscriber, its employees, affiliates and End-users is deemed a breach of contract and in lieu of determining damages, the parties agree in advance to damages equal to  $8,000 per image, per channel of use per medium plus interest at 1% per month or 18% per annum, and attorney's fees and collection/court costs.

6.  Amendments. The Parties agree that, in order to continually improve its Services, Adlife may, from time to time, amend its Site and Services in its discretion and will make commercially reasonable efforts to notify Subscribers of said amendments. Subscriber is encouraged to continually check the Site for notices of changes, updates, and improvements. ⬜

7.  Disclaimer of Warranties. Adlife does not represent or warrant that this Site or Services will be error-free, or free of viruses or other harmful components. The Site and Services are provided on an "as is" and "as available" basis. Adlife expressly disclaims all warranties, including the warranties of merchantability, and fitness for a particular purpose and non-infringement. Adlife disclaims all responsibility for any loss, injury, claim, liability, or damage of any kind resulting from, arising out of or any way related to (a) any errors in or omissions from this Site and Services; (b) the unavailability of this Site, Services, or any portion thereof; (c) Subscriber's use of this Site or Services; (d) Subscriber's use of any equipment or software in connection with the Site or Services; or (e) any third party web sites or content therein directly or indirectly accessed through links contained on the Site or through the Services.

8.  Limitation of Liability; Indemnification.

a) THE LIABILITY OF ADLIFE TO SUBSCRIBER FOR ANY AND ALL CAUSE(S) OF ACTION, REGARDLESS OF THE FORM OF ACTION (INCLUDING CONTRACT, TORT, NEGLIGENCE OR ANY OTHER), ARISING OUT OF OR RESULTING FROM THE PERFORMANCE OR BREACH OF THIS AGREEMENT WILL IN NO EVENT EXCEED THE AVERAGE MONTHLY SUBSCRIPTION FEES IN THE THEN-CURRENT TERM CONVERTED TO AN ANNUAL BASIS (I.E. AVERAGE MONTHLY SUBSCRIPTION FEES X 12). ⬜

b) ADLIFE SHALL NOT BE LIABLE TO SUBSCRIBER OR TO ANY THIRD PARTY FOR ANY SPECIAL, INDIRECT, INCIDENTAL, PUNITIVE, CONSEQUENTIAL DAMAGES, OR DAMAGES FROM LOST PROFITS, LOST USE, OR ANY OTHER DAMAGES OF ANY KIND WHATSOEVER IN ANY WAY DUE TO, RESULTING FROM, OR ARISING IN CONNECTION WITH THIS AGREEMENT OR THE USE OF OR INABILITY TO USE THIS

SITE OR SERVICES, EVEN IF THE PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. []

c) Subscriber agrees to indemnify, defend and hold harmless Adlife, its officers, directors, employees, agents, licensors, suppliers and any third party information providers to the Site or Services from and against all claims, losses, expenses, damages and costs, including reasonable attorneys' fees (collectively, "Losses"), resulting from or in connection with: (i) any breach of any obligation of Subscriber; (ii) violation of any applicable laws by Subscriber, its affiliates, and their respective officers, directors, employees, agents, contractors, End-users, or clients ("Subscriber Responsible Parties"); or (iii) any misuse, loss, damage, corruption, or destruction of the Services by Subscriber Responsible Parties or any breach of security relating to the same. []

9.  Additional Miscellaneous Provisions.

a) Governing Law; Jurisdiction; Venue; Attorney's Fees. This Agreement shall be construed in accordance with, and governed by, the laws of the State of Rhode Island, except for that body of law addressing conflicts of law. The Parties submit to the jurisdiction of said courts and waive any defense of forum non-convenes. The Parties waive all rights to jury trials. []

b) Assignments. This Agreement shall be binding upon and shall be for the benefit of Adlife and Subscriber and both Parties' respective legal representatives, successors, and permitted assigns; provided, that Subscriber shall not be entitled to assign, sublicense, or delegate this Agreement, in whole or in part, without Adlife's prior written consent. Any attempted assignment, delegation, or assumption of this Agreement not in accordance with this Section will be of no force or effect. []

c) Personal Information. Adlife agrees to protect Subscriber's Personal Information, as that term is defined in Adlife's Privacy Policy, in accordance with the terms of the Adlife Privacy Policy, which can be found here. https://preparedfoodphotos.com/privacy.policy.php []

d) Entire Agreement; Waiver; Relationship of the Parties. This Agreement constitutes the entire agreement between the Parties as to the subject matter hereof. No waiver of any provision of this Agreement shall be deemed, or shall constitute, a waiver of any other provision, nor shall any waiver constitute a continuing waiver. No waiver shall be binding unless executed in writing by the Parties. Nothing contained in this Agreement shall be construed as creating a joint venture, partnership, agency, or employment relationship between the Parties, and neither Party shall have any right to bind the other or incur any obligation on the other's behalf without the other's prior written consent. Except as expressly provided for herein, this Agreement is not for the benefit of any third party, but nothing in this Agreement shall prevent or interfere with any consumer bringing an action against Subscriber for violation of law.

e) Severability of Terms. If any provision of the Agreement is found by a court of competent jurisdiction to be invalid, the Parties nevertheless agree that the court should endeavor to give effect to the Parties' intentions as reflected in the provision, and the other provisions of the Agreement remain in full force and effect. []

f) **Amendment.** Notwithstanding Section 6, this Agreement may be modified only in writing, signed by a duly authorized representative of each Party. ▯

g) **Notices and Contact Information.** Any demand, notice, or other communication required or permitted hereunder shall be effective if in writing and either delivered to the addressee or the email set forth in the "Contact Us" section of the Site (for Adlife); or, if to Subscriber, at email set forth in the Subscriber registration page. Either Party may change its notice email address by providing the other Party with notice of the change. ▯

10. **Acknowledgement.** You acknowledge that you have read this Agreement, understand it and agree to be bound by its terms and conditions. You further agree that it is the complete and exclusive statement of the agreement between you and Adlife, which supersedes any proposal or prior agreement, oral or written, and other communication between you and Adlife relating to the subject matter of this Agreement.

This Agreement may be executed in counterparts and the Parties agree that electronic signatures are binding. The Parties have caused this Agreement to be executed by their authorized representatives as of the date set forth below.

SUBSCRIBER

By:_____
Title:_____
Date:  _Oct 1, 2019_____

Adlife Marketing & Communications Co., Inc.

By:_ *DOUGLAS FLEURANT EVP/CFO*
Title: Executive Vice President/Chief Financial Officer
Date:  XXXXXXXXXXXXX
        November 7, 2019

**END-USER SUBSCRIPTION AGREEMENT**

This End-User Subscription Agreement (the "Agreement") is by and between Adlife Marketing & Communications Company, Inc., with business offices located at 38 Church Street, Pawtucket, Rhode Island 02860 ("Adlife"), and ▓▓▓▓▓▓▓▓▓▓ with business offices located at ▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ AL ▓▓▓▓ (the "Subscriber"). This Agreement shall be effective as of the date executed by Adlife and Subscriber ("Effective Date").  Each of Adlife and Subscriber is a "Party" and together they are the "Parties" to this Agreement.

If you are entering into this Agreement on behalf of a company or other legal entity, you represent that you have the authority to bind such entity and its affiliates to these terms and conditions. If you do not have such authority, or if you do not agree with these terms and conditions, you must not accept this Agreement and may not use the services provided under this Agreement.

WHEREAS, Adlife has developed and maintains an Internet based subscription program allowing subscribers full access to stock photography on the website for the specific purposes of advertising subject to the conditions in this Agreement (the "Services"), provided said Subscriber is in good standing;

NOW, THEREFORE, the Parties hereto, for good and valuable consideration, the receipt, adequacy, and sufficiency of which are hereby acknowledged, and intending to be legally bound, hereby agree as follows:

1. **License Grant.**

    a) **License to Use Service.** Adlife hereby grants to Subscriber a nonexclusive, nontransferable, license during the Term (the "License") to access and use the Services in accordance with this Agreement. All rights not expressly granted to Subscriber under the License are reserved by Adlife. The License granted to Subscriber pursuant to this Agreement will permit use of the Services by a number of Subscriber employees or affiliates ("End-users"), not to exceed five (5) End-users. Subscribers with greater than five (5) End-users should contact Adlife to purchase a separate Enterprise license.

    SUBSCRIBER SHALL BE RESPONSIBLE FOR THE FAILURE OF ANY SUBSCRIBER EMPLOYEE OR AFFILIATE TO PERFORM ITS OBLIGATIONS UNDER THIS AGREEMENT. UPON TERMINATION OF THIS AGREEMENT, SUBSCRIBER AND ITS END-USERS SHALL IMMEDIATELY CEASE USE OF ANY AND ALL ADLIFE IMAGES.

    b) **Designated End-users.** Each End-user will be designated as an End-user within the subscription Services structure. The License to use the Services by each End-user may not be shared or used by more than five (5) End-users, but may be re-issued from time to time to new End-users upon prior written notification to and acceptance by Adlife. Any unauthorized access to Services, or other abuse or impermissible activity on the Site or in connection with the Services may result in immediate suspension or termination of End-user accounts pursuant to Section 6 of this Agreement. Subscriber will promptly notify Adlife of any unauthorized use of the Services in breach of this Agreement, any unauthorized use of accounts, or any other known or suspected breach of security.

    c) **Limitations on Use.** The Services are for use only by Subscriber and its assigned End- users. Except as permitted by this Agreement, the Services may not be transferred, distributed, resold, sublicensed, or used to create any derivative works. Subscriber may use the Site and Services only for its internal business purposes and

shall not use the Services in association with sending spam or otherwise duplicative or unsolicited messages; use the Services in association with infringing, obscene, threatening, libelous, or otherwise unlawful or tortuous material, including material harmful to children or material in violation of third party privacy rights; or attempt to gain unauthorized access to the Site, Services, or its related systems or networks.

2. **Service Details.**

The subscription plan enables the Subscriber to download vector files or JPG images (each a "Work" or "Works") of any available size. The Subscriber has the right to move a file (or files containing it) physically, but copies can be made only for back-up or archival purposes. Files downloaded from the Site may be used by the Subscriber for advertising or similar purposes as permitted by the License Agreement.

If a Work is in violation of a third-party right, Adlife may instruct Subscriber to cease all use, distribution and possession of such Work, and Subscriber must promptly comply with such instructions. Adlife reserves all rights not expressly granted in these terms.

Permitted Usage:

- Prints, posters and other reproductions for personal use, advertising and promotional applications, including printed files, product packaging, presentations, film and video presentations, commercials, catalogues, brochures, promotional greeting cards and promotional postcards (provided they are not for resale, license or other distribution);

- Print media applications, such as books and book covers, magazines, newspapers, editorials, and newsletters;

- On–line or electronic publications, including web pages, provided, that Subscriber takes all reasonable actions to prevent website visitors from downloading or revising Work that is published on a website; or

- Any other uses approved in writing by Adlife.

Subscribers with questions as to the permitted usage of a specific file should immediately contact Adlife.

Subscriber shall not:

- Use files on products for sale, such as t-shirts, cups, posters, etc., or in places designed for the sale or promotion of such products;

- Use files or their elements as a part of a trademark or trade sign (in full or in part), a company's name, a logo, or a product's trade name;

- Post the Work online in a downloadable format;

- Use files in such a way that would allow a third party to download, transmit, distribute, or preform some other similar means of file exchange, including but not limited to the use of portable storage devices; or

- Use the Services to directly compete with Adlife or to solicit customers or accounts of Adlife.

Subscriber may use the license granted under this Agreement for the benefit of one of its clients, provided that Subscriber's client must also comply with these terms and comply with all license and use restrictions. Subscriber is solely responsible and liable for any and all use of the Work by its client. If Subscriber intends to use the same Work for the benefit of clients with more than twelve (12) locations or if Subscriber intends to use the same Work with more than twelve (12) unique clients, then Subscriber must purchase a separate Enterprise license.

Clients of Subscribers may only use licensed Works as long as the Subscriber maintains an active subscription to the Service. Upon termination, Subscriber and Subscriber's clients must discontinue use of the Works, except that clients of Subscribers may continue to distribute pre-printed stock items containing the Work or Works for a period of six months following the termination of the Subscriber's subscription.

Each client of Subscriber must be designated, in writing, to Adlife as a client of the Subscriber. Any unauthorized access to Services, or other abuse or impermissible activity on the Site or in connection with the Services may result in immediate suspension or termination of Subscriber accounts pursuant to Section 6 of this Agreement. Subscriber will promptly notify Adlife of any unauthorized use of the Services in breach of this Agreement, any unauthorized use of accounts, or any other known or suspected breach of security.

3. **Adlife Proprietary Information.** The Site, Services, and its Contents ("Adlife IP") are owned or licensed by Adlife and protected by U.S. and international copyright, trademark, service mark, patent and/or other proprietary rights and laws. Except as expressly provided in this Agreement, nothing contained herein shall be construed as conferring to Subscriber any license or right under copyright or other intellectual property law. No part of the Adlife IP may be altered, copied, photocopied, reproduced, translated or reduced to any electronic medium or machine- readable form, in whole or in part, except as specifically provided in this Agreement. Subscriber shall not take any action that shall interfere with or diminish Adlife's right in any of the Adlife IP.

4. **Term, Suspension, and Termination.**

   a) **Term.** Unless terminated earlier pursuant to this Section 5 of this Agreement, the initial term ("Initial Term") of this Agreement shall be for a period of twelve (12) months from the Effective Date and shall thereafter automatically continue under this Agreement annually, for successive twelve-month (12) periods ("Subsequent Term") unless either Party provides a thirty-day (30) written notice of termination prior to the end of each twelve-month period. The Initial Term and Subsequent Term shall together be known as the "Term".

   b) **Suspension with Right to Cure.** In addition to any other rights and remedies outlined in this Agreement, Adlife reserves the right to suspend the License and Subscriber's access to the Services upon ten (10) days' written notice to Subscriber ("Cure Period") if Subscriber's account becomes delinquent by non-payment for more than fifteen (15) days and such delinquency is not cured within the Cure Period or any other default by Subscriber hereof. Delinquent invoices are subject to interest of one percent (1.0%) per month on any outstanding balance, or the maximum permitted by law, whichever is less, plus all expenses of collection. Subscriber will continue to be charged for the remainder of the term for any delinquent accounts or for breach of this Agreement, to the extent applicable.

5.  **Fees and Payment.**

    a) **Subscription Fees.** The annual Subscription Fee is **$1,188.00 (One Thousand One Hundred and eighty-eight dollars and 00 cents)**. This fee is to be paid contemporaneously with the execution of this agreement. The same may be amended from time to time, after the first twelve months following the Effective Date.

    b) **Additional End-users.** Subscriber may add End-user licenses at any time during the Initial or Subsequent Terms. Subscriber will be charged in full for any portion of a calendar month during which End-user licenses have been added. Although Subscriber may decrease End-user licenses at any time, there will be no refunds issued to Subscriber, regardless of nonpayment, nonuse, or other conduct or inaction, and all Subscription Fees will continue to be due through the end of the Initial or Subsequent Terms.

    c) **Enterprise Licenses.** Enterprise licenses are available for Subscribers who need greater than five (5) End-user licenses or who need to use any Work for the benefit of clients with more than twelve (12) locations or with more than twelve (12) unique clients. Please contact Adlife to obtain a separate Enterprise license.

    d) **Taxes and Duties.** Adlife's fees are exclusive of all taxes, levies, or duties imposed by taxing authorities, and Subscriber will be responsible for payment of all such taxes, levies, or duties, excluding only United States (federal or state), local, or other taxes based solely on Adlife's income.

    e) **Exclusive, Unlicensed, and Prohibited Use.** Exclusive use of Adlife photography is available at a rate starting at $8,000 per image, per medium/channel of use. Any unlicensed or prohibited use of any Adlife photography will carry with it a minimum penalty of at least $8,000 per image, per medium/channel of use.

6.  **Amendments.** The Parties agree that, in order to continually improve its Services, Adlife may, from time to time, amend its Site and Services in its discretion and will make commercially reasonable efforts to notify Subscribers of said amendments. Subscriber is encouraged to continually check the Site for notices of changes, updates, and improvements.

7.  **Disclaimer of Warranties.** Adlife does not represent or warrant that this Site or Services will be error-free, or free of viruses or other harmful components. The Site and Services are provided on an "as is" and "as available" basis. Adlife expressly disclaims all warranties, including the warranties of merchantability, and fitness for a particular purpose and non-infringement. Adlife disclaims all responsibility for any loss, injury, claim, liability, or damage of any kind resulting from, arising out of or any way related to (a) any errors in or omissions from this Site and Services; (b) the unavailability of this Site, Services, or any portion thereof; (c) Subscriber's use of this Site or Services; (d) Subscriber's use of any equipment or software in connection with the Site or Services; or (e) any third party web sites or content therein directly or indirectly accessed through links contained on the Site or through the Services.

8.  **Limitation of Liability; Indemnification.**

    a) THE LIABILITY OF ADLIFE TO SUBSCRIBER FOR ANY AND ALL CAUSE(S) OF ACTION, REGARDLESS OF THE FORM OF ACTION (INCLUDING CONTRACT, TORT, NEGLIGENCE OR ANY OTHER), ARISING OUT OF OR RESULTING FROM THE PERFORMANCE OR BREACH OF THIS AGREEMENT WILL IN NO EVENT EXCEED THE AVERAGE MONTHLY SUBSCRIPTION FEES IN THE THEN-CURRENT TERM

CONVERTED TO AN ANNUAL BASIS (I.E. AVERAGE MONTHLY SUBSCRIPTION FEES X 12).

b) ADLIFE SHALL NOT BE LIABLE TO SUBSCRIBER OR TO ANY THIRD PARTY FOR ANY SPECIAL, INDIRECT, INCIDENTAL, PUNITIVE, CONSEQUENTIAL DAMAGES, OR DAMAGES FROM LOST PROFITS, LOST USE, OR ANY OTHER DAMAGES OF ANY KIND WHATSOEVER IN ANY WAY DUE TO, RESULTING FROM, OR ARISING IN CONNECTION WITH THIS AGREEMENT OR THE USE OF OR INABILITY TO USE THIS SITE OR SERVICES, EVEN IF THE PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

c) Subscriber agrees to indemnify, defend and hold harmless Adlife, its officers, directors, employees, agents, licensors, suppliers and any third party information providers to the Site or Services from and against all claims, losses, expenses, damages and costs, including reasonable attorneys' fees (collectively, "Losses"), resulting from or in connection with: (i) any breach of any obligation of Subscriber; (ii) violation of any applicable laws by Subscriber, its officers, directors, employees, agents, contractors, or affiliates, End-users, or clients ("Subscriber Responsible Parties"); or (iii) any misuse, loss, damage, corruption, or destruction of the Services by Subscriber Responsible Parties or any breach of security relating to the same.

9. **Additional Miscellaneous Provisions.**

a) **Governing Law; Jurisdiction; Venue; Attorney's Fees.** This Agreement shall be construed in accordance with, and governed by, the laws of the State of Rhode Island, except for that body of law addressing conflicts of law. The Parties submit to the jurisdiction of said courts and waive any defense of forum non conveniens. The Parties waive all rights to jury trials.

b) **Assignments.** This Agreement shall be binding upon and shall be for the benefit of Adlife and Subscriber and both Parties' respective legal representatives, successors, and permitted assigns; provided, that Subscriber shall not be entitled to assign, sublicense, or delegate this Agreement, in whole or in part, without Adlife's prior written consent. Any attempted assignment, delegation, or assumption of this Agreement not in accordance with this Section will be of no force or effect.

c) **Personal Information.** Adlife agrees to protect Subscriber's Personal Information, as that term is defined in Adlife's Privacy Policy, in accordance with the terms of the Adlife Privacy Policy, which can be found here. https://preparedfoodphotos.com/privacy.policy.php

d) **Entire Agreement; Waiver; Relationship of the Parties.** This Agreement constitutes the entire agreement between the Parties as to the subject matter hereof. No waiver of any provision of this Agreement shall be deemed, or shall constitute, a waiver of any other provision, nor shall any waiver constitute a continuing waiver. No waiver shall be binding unless executed in writing by the Parties. Nothing contained in this Agreement shall be construed as creating a joint venture, partnership, agency, or employment relationship between the Parties, and neither Party shall have any right to bind the other or incur any obligation on the other's behalf without the other's prior written consent. Except as expressly provided for herein, this Agreement is not for the benefit of any third party, but nothing in this Agreement shall prevent or interfere with any consumer bringing an action against Subscriber for violation of law.

e) **Severability of Terms.** If any provision of the Agreement is found by a court of competent jurisdiction to be invalid, the Parties nevertheless agree that the court should endeavor to give effect to the Parties' intentions as reflected in the provision, and the other provisions of the Agreement remain in full force and effect.

f) **Amendment.** Notwithstanding Section 6,this Agreement may be modified only in writing, signed by a duly authorized representative of each Party.

g) **Notices and Contact Information.** Any demand, notice, or other communication required or permitted hereunder shall be effective if in writing and either delivered to the addressee or the email set forth in the "Contact Us" section of the Site (for Adlife); or, if to Subscriber, at email set forth in the Subscriber registration page. Either Party may change its notice email address by providing the other Party with notice of the change.

10. **Acknowledgement.** You acknowledge that you have read this Agreement, understand it and agree to be bound by its terms and conditions. You further agree that it is the complete and exclusive statement of the agreement between you and Adlife, which supersedes any proposal or prior agreement, oral or written, and other communication between you and Adlife relating to the subject matter of this Agreement.

This Agreement may be executed in counterparts and the Parties agree that electronic signatures are binding. The Parties have caused this Agreement to be executed by their authorized representatives as of the date set forth below.

Adlife Marketing & Communications Company, Inc.

By: _Douglas Fleurant, CFO_  
Title: _Chief Financial Officer_  
Date: _05-16-19_

By: _____  
Title: _____  
Date: _5-16-19_

# SUBSCRIBER AGREEMENT

This End-User Subscription Agreement (the "Agreement") is by and between Adlife Marketing & Communications Company, Inc., with business offices located at 38 Church Street, Pawtucket, Rhode Island 02860 ("Adlife"), and ███████████████ with business offices located at ███ ████████████████ Z █████(the "Subscriber"). This Agreement shall be effective as of the date executed by Adlife and Subscriber ("Effective Date"). Each of Adlife and Subscriber is a "Party" and together they are the "Parties" to this Agreement.

If you are entering into this Agreement on behalf of a company or other legal entity, you represent that you have the authority to bind such entity and its affiliates to these terms and conditions. If you do not have such authority, or if you do not agree with these terms and conditions, you must not accept this Agreement and may not use the services provided under this Agreement.

Subscriber further understands that the terms of use are applicable to Subscriber's End-users, and Subscriber is responsible for (i) communication of the terms and conditions of this Agreement to all End-users and (ii) failure by the End-user to abide by the terms and conditions of this Agreement as more fully set forth herein.

Adlife has developed and maintains an Internet based subscription program allowing subscribers full access to stock photography on the website for the specific purposes of advertising subject to the conditions in this Agreement (the "Services"), provided said Subscriber is in good standing.

NOW, THEREFORE, the Parties hereto, for good and valuable consideration, the receipt, adequacy, and sufficiency of which are hereby acknowledged, and intending to be legally bound, hereby agree as follows:

1. **License Grant.**

   a) **License to Use Service.** Adlife hereby grants to Subscriber a nonexclusive, nontransferable license during the Term (the "License") to access and use the Services in accordance with this Agreement. All rights not expressly granted to Subscriber under the License are reserved by Adlife. The License granted to Subscriber pursuant to this Agreement will permit use of the Services by a number of Subscriber employees or affiliates ("End-users"), not to exceed five (5) End-users. Subscribers with greater than five (5) End-users should contact Adlife to purchase a separate Enterprise license.

   b) This license is personal to Subscriber, with no right to sub-license, distribute or make available to any other person, media or entity for any purpose. Accordingly, Subscriber agrees not to copy, re-produce, re-sell, re-syndicate, incorporate images into a new product for resale on a one-time or syndicated basis or otherwise distribute any of the Adlife Images, by any means or method (Other than the use of the same by Subscriber in the development of custom advertising materials to a single user or entity).

SUBSCRIBER SHALL BE RESPONSIBLE FOR THE FAILURE OF ANY SUBSCRIBER EMPLOYEE, AFFILIATE OR OTHER END-USER TO PERFORM ITS OBLIGATIONS UNDER THIS AGREEMENT. UPON TERMINATION OF THIS AGREEMENT,

SUBSCRIBER AND ITS EMPLOYEES, AFFILIATES AND END-USERS SHALL IMMEDIATELY CEASE USE OF ANY AND ALL ADLIFE IMAGES.

c) **Designated End-users.** Each End-user will be designated as an End-user within the subscription Services structure. The License to use the Services by each End-user may not be shared or used by more than five (5) End-users, but may be re-issued from time to time to new End-users upon prior written notification to and acceptance by Adlife. Any unauthorized access to Services, or other abuse or impermissible activity on the Site or in connection with the Services may result in immediate suspension or termination of End-user accounts pursuant to Section 6 of this Agreement or for damages as set forth below. Subscriber will promptly notify Adlife of any unauthorized use of the Services in breach of this Agreement, any unauthorized use of accounts, or any other known or suspected breach of security.

d) **Limitations on Use.** The Services are for use only by Subscriber and its assigned End-users. Except as permitted by this Agreement, the Services may not be transferred, distributed, resold, sublicensed, or used to create any derivative works. Subscriber may use the Site and Services only for its internal business purposes and shall not use the Services in association with sending spam or otherwise duplicative or unsolicited messages; use the Services in association with infringing, obscene, threatening, libelous, or otherwise unlawful or tortuous material, including material harmful to children or material in violation of third party privacy rights; or attempt to gain unauthorized access to the Site, Services, or its related systems or networks. Subscriber is responsible for ensuring that all Subscriber employees, affiliates and End-users have a copy of this Agreement and/or are advised in writing of the terms and conditions, and the penalties for breach, including without limitation termination, suspension or penalty of $8,000 per image, medium/channel of use.

e) **Download Management.** Adlife provides Subscriber access to its entire library. Accordingly, Adlife does not keep track of which images Subscriber downloads or utilizes for purposes of avoiding any violation of Adlife's copyright rights should this subscription ever be terminated, Adlife strongly encourages Subscriber to keep track of which images Subscriber and its users download. Subscriber should contact Adlife at least 90 days in advance if Subscriber anticipates difficulty in isolating and discontinuing use Adlife's images.

f) **Release of Past Claims.** In consideration for payment of one year of Subscription Fees in accordance with the terms of Section 5 of this Agreement, Adlife hereby expressly releases and discharges Subscriber from any and all claims arising from or related to actual or alleged copyright infringement in connection with Subscriber's past use of images owned by or licensed to Adlife or its predecessors.

2. **Service Details.**

The subscription plan enables the Subscriber to download vector files or JPG images (each a "Work" or "Works") of any available size. The Subscriber has the right to move a file (or files containing it) physically, but copies can be made only for back-up or archival purposes. Files downloaded from the Site may be used by the Subscriber for advertising or similar purposes as permitted by the License Agreement.

If a Work is in violation of a third-party right, Adlife may instruct Subscriber to cease all use, distribution and possession of such Work, and Subscriber must promptly comply with such instructions. Adlife reserves all rights not expressly granted in these terms.

2

**Permitted Usage:**

- Prints, posters and other reproductions for personal use, advertising and promotional applications, including printed files, product packaging, presentations, film and video presentations, commercials, catalogues, brochures, promotional greeting cards and promotional postcards (provided they are not for resale, license or other distribution);

- Print media applications, such as books and book covers, magazines, newspapers, editorials, and newsletters;

- On–line or electronic publications, including web pages, electronically distributed newsletters and email correspondence, provided, that Subscriber takes all reasonable actions to prevent website visitors from downloading or revising Work that is published on a website; or

- Any other uses approved in writing by Adlife.

Subscribers with questions as to the permitted usage of a specific file should immediately contact Adlife.

**Subscriber shall not:**

- Use files on products for sale, such as t-shirts, cups, posters, etc., or in places designed for the sale or promotion of such products;

- Use files or their elements as a part of a trademark or trade sign (in full or in part), a company's name, a logo, or a product's trade name;

- Post the Work online in a downloadable format;

- Use files in such a way that would allow a third party to download, transmit, distribute, or perform some other similar means of file exchange, including but not limited to the use of portable storage devices; or

- Use the Services to directly compete with Adlife or to solicit customers or accounts of Adlife.

   Subscriber may use the license granted under this Agreement for the benefit of one of its clients, provided that Subscriber's client must also comply with these terms and comply with all license and use restrictions. Subscriber is solely responsible and liable for any and all use of the Work by its client. If Subscriber intends to use the same Work for the benefit of clients with more than twelve (12) locations or if Subscriber intends to use the same Work with more than twelve (12) unique clients, then Subscriber must purchase a separate Enterprise license.

   Clients of Subscribers may only use licensed Works as long as the Subscriber maintains an active subscription to the Service. Upon termination, Subscriber and Subscriber's clients must discontinue use of the Works, except that clients of Subscribers may continue to distribute pre-printed stock items containing the Work or Works for a period of six months following the termination of the Subscriber's subscription.

Each client of Subscriber must be designated, in writing, to Adlife as a client of the Subscriber. Any unauthorized access to Services, or other abuse or impermissible activity on the Site or in connection with the Services may result in immediate suspension or termination of Subscriber accounts pursuant to Section 6 of this Agreement. Subscriber will promptly notify Adlife of any unauthorized use of the Services in breach of this Agreement, any unauthorized use of accounts, or any other known or suspected breach of security.

3. **Adlife Proprietary Information.** The Site, Services, and its Contents ("Adlife IP") are owned or licensed by Adlife and protected by U.S. and international copyright, trademark, service mark, patent and/or other proprietary rights and laws. Except as expressly provided in this Agreement, nothing contained herein shall be construed as conferring to Subscriber any license or right under copyright or other intellectual property law. No part of the Adlife IP may be altered, copied, photocopied, reproduced, translated or reduced to any electronic medium or machine- readable form, in whole or in part, except as specifically provided in this Agreement. Subscriber shall not take any action that shall interfere with or diminish Adlife's right in any of the Adlife IP.

4. **Term, Suspension, and Termination.**

a) **Term.** Unless terminated earlier pursuant to this Section 5 of this Agreement, the initial term ("Initial Term") of this Agreement shall be for a period of twelve (12) months from the Effective Date. The Initial Term and Subsequent Term shall together be known as the "Term". If this Agreement is continued for one or more Terms, the terms and conditions of this Agreement shall be automatically updated to be consistent with the most current End-User Subscription Agreement on the Site, without any further amendment in writing between Adlife and Subscriber. The most current End-User Subscription Agreement shall be available on the Site.

b) **Suspension with Right to Cure.** In addition to any other rights and remedies outlined in this Agreement, Adlife reserves the right to suspend the License and Subscriber's access to the Services upon ten (10) days' written notice to Subscriber ("Cure Period") if Subscriber's account becomes delinquent by non-payment for more than fifteen (15) days and such delinquency is not cured within the Cure Period or any other default by Subscriber hereof. Delinquent invoices are subject to interest of one percent (1.0%) per month on any outstanding balance, or the maximum permitted by law, whichever is less, plus all expenses of collection. Subscriber will continue to be charged for the remainder of the term for any delinquent accounts or for breach of this Agreement, to the extent applicable.

5. **Fees and Payment.**

a) **Subscription Fees.** The Subscription Fees are **$500.00** per month, during the period Subscriber is an active participant in the weekly Bad-Adz Digital Email Program, and the same may be amended from time to time.  Payment is to be made using company credit card provided by Subscriber. In the event the Subscriber discontinues weekly participation in the Bad-Adz Digital Email Program, this subscription fee will automatically increase to $999.00 per month with notice to Subscriber not required.

b) **Additional End-users.** Subscriber may add End-user licenses at any time during the Initial or Subsequent Terms. Subscriber will be charged in full for any portion of a calendar month during which End-user licenses have been added. Although Subscriber may decrease End-user licenses at any time, there will be no refunds issued to Subscriber, regardless of nonpayment, nonuse, or other conduct or

4

inaction, and all Subscription Fees will continue to be due through the end of the Initial or Subsequent Terms.

c) **Enterprise Licenses.** Enterprise licenses are available for Subscribers who need greater than five (5) End-user licenses or who need to use any Work for the benefit of clients with more than twelve (12) locations or with more than twelve (12) unique clients. Please contact Adlife to obtain a separate Enterprise license.

d) **Taxes and Duties.** Adlife's fees are exclusive of all taxes, levies, or duties imposed by taxing authorities, and Subscriber will be responsible for payment of all such taxes, levies, or duties, excluding only United States (federal or state), local, or other taxes based solely on Adlife's income.

f) **Exclusive, Unlicensed, and Prohibited Use.** Exclusive use of Adlife photography is available at a rate starting at $8,000 per image, per channel of use, per medium. Any unlicensed or prohibited use of any Adlife photography by Subscriber, its employees, affiliates and End-users is deemed a breach of contract and in lieu of determining damages, the parties agree in advance to damages equal to  $8,000 per image, per channel of use per medium plus interest at 1% per month or 18% per annum, and attorney's fees and collection/court costs.

It is acknowledged that the Subscriber's unlicensed or prohibited use of Adlife photography will cause Adlife to incur substantial economic damages and losses of types including, but not limited to, lost license fees, costs associated with monitoring and detecting said unlicensed or prohibited uses, statutory damages for copyright infringement, disgorgement of profits attributable to said unlicensed or prohibited uses, prelitigation legal fees and costs, etc. It is acknowledged that such losses will occur in amounts which are impossible to compute and ascertain with certainty as a basis for recovery by Adlife, and that liquidated damages represent a fair, reasonable and appropriate estimate thereof.

6. **Amendments.** The Parties agree that, in order to continually improve its Services, Adlife may, from time to time, amend its Site and Services in its discretion and will make commercially reasonable efforts to notify Subscribers of said amendments. Subscriber is encouraged to continually check the Site for notices of changes, updates, and improvements.

7. **Disclaimer of Warranties.** Adlife does not represent or warrant that this Site or Services will be error-free, or free of viruses or other harmful components. The Site and Services are provided on an "as is" and "as available" basis. Adlife expressly disclaims all warranties, including the warranties of merchantability, and fitness for a particular purpose and non-infringement. Adlife disclaims all responsibility for any loss, injury, claim, liability, or damage of any kind resulting from, arising out of or any way related to (a) any errors in or omissions from this Site and Services; (b) the unavailability of this Site, Services, or any portion thereof; (c) Subscriber's use of this Site or Services; (d) Subscriber's use of any equipment or software in connection with the Site or Services; or (e) any third party web sites or content therein directly or indirectly accessed through links contained on the Site or through the Services.

8. **Limitation of Liability; Indemnification.**

a) THE LIABILITY OF ADLIFE TO SUBSCRIBER FOR ANY AND ALL CAUSE(S) OF ACTION, REGARDLESS OF THE FORM OF ACTION (INCLUDING CONTRACT, TORT, NEGLIGENCE OR ANY OTHER), ARISING OUT OF OR RESULTING FROM THE PERFORMANCE OR BREACH OF THIS AGREEMENT WILL IN NO EVENT EXCEED THE AVERAGE MONTHLY SUBSCRIPTION FEES IN THE THEN-CURRENT TERM CONVERTED TO AN ANNUAL BASIS (I.E. AVERAGE MONTHLY SUBSCRIPTION FEES X 12).

b) ADLIFE SHALL NOT BE LIABLE TO SUBSCRIBER OR TO ANY THIRD PARTY FOR ANY SPECIAL, INDIRECT, INCIDENTAL, PUNITIVE, CONSEQUENTIAL DAMAGES, OR DAMAGES FROM LOST PROFITS, LOST USE, OR ANY OTHER DAMAGES OF ANY KIND WHATSOEVER IN ANY WAY DUE TO, RESULTING FROM, OR ARISING IN CONNECTION WITH THIS AGREEMENT OR THE USE OF OR INABILITY TO USE THIS SITE OR SERVICES, EVEN IF THE PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

c) Subscriber agrees to indemnify, defend and hold harmless Adlife, its officers, directors, employees, agents, licensors, suppliers and any third party information providers to the Site or Services from and against all claims, losses, expenses, damages and costs, including reasonable attorneys' fees (collectively, "Losses"), resulting from or in connection with: (i) any breach of any obligation of Subscriber; (ii) violation of any applicable laws by Subscriber, its affiliates, and their respective officers, directors, employees, agents, contractors, End-users, or clients ("Subscriber Responsible Parties"); or (iii) any misuse, loss, damage, corruption, or destruction of the Services by Subscriber Responsible Parties or any breach of security relating to the same.

9. **Additional Miscellaneous Provisions.**

a) **Governing Law; Jurisdiction; Venue; Attorney's Fees.** This Agreement shall be construed in accordance with, and governed by, the laws of the State of Rhode Island, except for that body of law addressing conflicts of law. The Parties submit to the jurisdiction of said courts and waive any defense of forum non-convenes. The Parties waive all rights to jury trials.

b) **Assignments.** This Agreement shall be binding upon and shall be for the benefit of Adlife and Subscriber and both Parties' respective legal representatives, successors, and permitted assigns; provided, that Subscriber shall not be entitled to assign, sublicense, or delegate this Agreement, in whole or in part, without Adlife's prior written consent. Any attempted assignment, delegation, or assumption of this Agreement not in accordance with this Section will be of no force or effect.

c) **Personal Information.** Adlife agrees to protect Subscriber's Personal Information, as that term is defined in Adlife's Privacy Policy, in accordance with the terms of the Adlife Privacy Policy, which can be found here.
https://preparedfoodphotos.com/privacy.policy.php

d) **Entire Agreement; Waiver; Relationship of the Parties.** This Agreement constitutes the entire agreement between the Parties as to the subject matter hereof. No waiver of any provision of this Agreement shall be deemed, or shall constitute, a waiver of any other provision, nor shall any waiver constitute a continuing waiver. No waiver shall be binding unless executed in writing by the Parties. Nothing contained in this Agreement shall be construed as creating a joint venture, partnership, agency, or employment relationship between the Parties, and neither Party shall have any right to bind the other

6

e) **Severability of Terms.** If any provision of the Agreement is found by a court of competent jurisdiction to be invalid, the Parties nevertheless agree that the court should endeavor to give effect to the Parties' intentions as reflected in the provision, and the other provisions of the Agreement remain in full force and effect.

f) **Amendment.** Notwithstanding Section 6, this Agreement may be modified only in writing, signed by a duly authorized representative of each Party.

g) **Notices and Contact Information.** Any demand, notice, or other communication required or permitted hereunder shall be effective if in writing and either delivered to the addressee or the email set forth in the "Contact Us" section of the Site (for Adlife); or, if to Subscriber, at email set forth in the Subscriber registration page. Either Party may change its notice email address by providing the other Party with notice of the change.

10. **Acknowledgement.** You acknowledge that you have read this Agreement, understand it and agree to be bound by its terms and conditions. You further agree that it is the complete and exclusive statement of the agreement between you and Adlife, which supersedes any proposal or prior agreement, oral or written, and other communication between you and Adlife relating to the subject matter of this Agreement.

This Agreement may be executed in counterparts and the Parties agree that electronic signatures are binding. The Parties have caused this Agreement to be executed by their authorized representatives as of the date set forth below.

By:_____
Title: President
Date:_____

**Adlife Marketing & Communications Co., Inc.**

By:_____
Title:  President
Date:  June 2, 2020

Levy Second Affirmation
Exhibit K

Rebecca Jones
January 04, 2024

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

PREPARED FOOD PHOTOS, INC.
f/k/a ADLIFE MARKETING &
COMMUNICATIONS CO., INC.,

          Plaintiff,          Case No:   1:23-cv-11085-RGS

vs.

WENEEDAVACATION.COM, LLC

          Defendant.
_____/

REMOTE DEPOSITION OF
REBECCA JONES

VOLUME 1 (Pages 1 - 138)

Thursday, January 4, 2024
9:04 a.m. to 1:31 p.m.

LOCATION:  Remote via Zoom
Lincoln, Rhode Island

Stenographically Reported By:
Annemarie L. Grant, CCR-KY

Job No. 343017

Rebecca Jones
January 04, 2024

Page 2

```
 1   APPEARANCES: (All parties appeared via Zoom remotely)
 2      On behalf of PLAINTIFF:
        CopyCat Legal, LLC
 3      3111 North University Dr., Suite 301
        Coral Springs, Florida  33065
 4      (877) 437-6228
 5      BY:  LAUREN HAUSMAN, ESQ.
        lauren@copycatlegal.com
 6
 7
 8      On behalf of DEFENDANT:
        Stearns Weaver Miller Weissler Alhadeff &
 9      Sitterson, P.A.
        106 East College Avenue, Suite 700
10      Tallahassee, Florida  32301
        (850) 580-7200
11
        BY:  ADRIENNE LOVE, ESQ.
12      alove@stearnsweaver.com
13
14
15
16
17
18      Also present:  Katherine Yarbrough
        Notary Public, State of Florida
19      Expires:  6/29/2027
        Notary Commission No. HH-416985
20
21
22
23
24
25
```

Page 3

```
 1                   I N D E X
 2   Witness      DIRECT    CROSS   REDIRECT   RECROSS
 3   REBECCA JONES
 4     By Ms. Love      4               135
       By Ms. Hausman         130
 5
 6
 7
 8
 9   CERTIFICATE OF REPORTER                     138
10
                 DEPOSITION EXHIBITS
11
12   Exhibit No. 1.......................................21
        (Notice of remote 30(b)(6) deposition)
13
        Exhibit No. 2.....................................42
14         (Image of Clambake007)
15   Exhibit No. 3.......................................44
        (Image of Cape Cod Dinner Company)
16
        Exhibit No. 4.....................................50
17         (Subscriber agreement)
18   Exhibit No. 5.......................................65
        (Wayback image of adlife.com)
19
        Exhibit No. 6.....................................94
20         (Infringement reports)
21   Exhibit No. 7......................................112
        (June 15, 2022, letter from CopyCat Legal to
22      WeNeedaVacation)
23
24
25
```

Page 4

```
 1   Proceedings began at 9:04 a.m.:
 2              NOTARY:  I am Katherine Yarbrough,
 3   Florida Notary Public and on staff at Lexitas Legal.
 4   I'll be swearing in the witness, who is the corporate
 5   rep for Prepared Food Photos, Rebecca Jones.
 6              Ms. Jones, do you consent to my
 7   administering the oath remotely?
 8       THE WITNESS:  Yes.
 9              NOTARY:  Also, would you tell us in
10   what city and state are you currently located in at
11   this moment?
12       THE WITNESS:  I'm currently in
13   Lincoln, Rhode Island.
14              NOTARY:  Would you please raise your
15   right hand.  Do you swear the testimony you're about
16   to give is the truth, the whole truth, and nothing but
17   the truth?
18       THE WITNESS:  I do.
19              NOTARY:  Thank you to everyone.  I'm
20   now leaving the meeting.  You-all have a good day.
21       THE WITNESS:  Thank you.
22       MS. LOVE:  Thank you, Katherine.
23              DIRECT EXAMINATION
24   BY MS. LOVE:
25       Q.     My name is Adrienne Love.  I'm with
```

Page 5

```
 1   Stearns Weaver Miller and I represent
 2   WeNeedaVacation.com, LLC.  I'm going to refer to
 3   WeNeedaVacation.com, LLC throughout as "WNV" to
 4   make it simple here.
 5          As Katherine said, this deposition is
 6   being recorded.  I'll go through basic rules.  Please
 7   answer everything with a yes or a no, not a shrug or a
 8   nod so that the court reporter can record your answer.
 9          Please wait until I finish the
10   complete question before you answer.  And if you need
11   a question repeated, feel free to let me know and the
12   court reporter can read that back to you.
13          Additionally, let me know if you don't
14   understand a question or you need me to rephrase a
15   question; I'm happy to do that as well.  And if -- I
16   know we're on Zoom today, but if you need a break --
17   we all may need breaks as well -- we can take a break
18   at any time as long as there isn't a question pending.
19          You've already stated your full name
20   for the record.  Have you ever been deposed before,
21   Rebecca?
22       A.     I have not.
23       Q.     Okay.  And do you understand that
24   you're testifying under oath and under penalty of
25   perjury?
```

Rebecca Jones
January 04, 2024

Page 58

1    of our subscribers.

2        Q.    Do you think it's reasonable to pay

3    $12,000 a year to use one photo?

4        A.    I think it's fair to pay 12,000 a year

5    for access to over 18,000 images.

6        Q.    But I asked a different question.  So

7    do you want the court reporter to reread my question?

8        A.    No, it's fine.  I'm sorry, yes.  Can

9    she reread the question?

10            THE STENOGRAPHER:  Yes, just a moment.

11       (The stenographer reads the record.)

12            THE WITNESS:  No.

13   BY MS. LOVE:

14       Q.    Okay.  And if there are over 18 -- or,

15   on average, 18,000 photos in PFP's library of photos,

16   that works out to about 66 cents on average per image

17   per year for one photo, correct?

18       A.    I suppose if you calculate it out that

19   way, yes.

20       Q.    Has any third party ever requested a

21   license for one photo from Prepared Food?

22       A.    They've requested, yes.

23       Q.    And how much have they offered to pay

24   for that?

25       A.    We don't entertain that.

Page 59

1        Q.    So you just say no to the request?

2        A.    Yes.

3        Q.    Has anyone, to your recollection, ever

4    presented an offer for a price for that photo?

5        A.    Has anyone ever presented a price --

6    for any photo?  Or for...

7        Q.    Yes.  If a third party has requested a

8    license for one photo.

9        A.    Yes.

10       Q.    Have they ever made an offer --

11       A.    Yes.

12       Q.    -- in that request?

13       A.    Yes.

14       Q.    And what were their offers?

15       A.    They ranged from -- it was a wide

16   range.

17       Q.    So what kind of range?

18       A.    I would say $5 to $250.

19       Q.    And for what kind of term of use?

20       A.    It was never -- it was -- the

21   discussion never got that far.

22       Q.    Okay.  So they may have said, Hey,

23   we'd like to use one photo for -- we want to be able

24   to get a one-use license agreement for one photo for

25   200 bucks?

Page 60

1        A.    Uh-huh.

2        Q.    Correct?  Okay.

3        A.    Correct.

4        Q.    And in the last three years, has PFP

5    ever entered into agreements that allow a third party

6    to use one image?

7        A.    I'm sorry.  Can you repeat that?

8        Q.    In the last three years, has PFP ever

9    entered any agreements that allow a third party to use

10   just one image?

11       A.    No.

12       Q.    What about people that PFP has sued or

13   threatened to sue?

14       A.    No.

15       Q.    Are there any settlement agreements

16   that allow for the use of one image or a few images?

17       A.    No.

18       Q.    So right at this time or in the last

19   three years, PFP does not have any license agreements

20   or agreements to allow use of anything other than

21   their library of photos which consists of about, on

22   average, 18,000 photos, correct?

23       A.    Correct.

24       Q.    So between 2016 and today, has PFP

25   ever allowed a third party to use one or more images

Page 61

1    apart from a subscriber agreement?

2        A.    I'm sorry.  Can you say that again?

3        Q.    Between 2016 and today, has PFP ever

4    allowed any third parties to use one or more images

5    apart from a subscriber agreement?

6        A.    No.

7        Q.    And, of course, that would -- you're

8    not including any agreements that any third party

9    would have licensed, such as iStock or Getty, correct?

10       A.    Correct.  Because that would have been

11   prior to 2016.

12       Q.    Okay.  And has PFP ever settled a case

13   and allowed a third party to continue to use a PFP

14   photo?

15       A.    A single photo?

16       Q.    Single or a few, anything lower than

17   the full library of photos.

18       A.    No.

19       Q.    Have you ever settled -- has PFP ever

20   settled a case and entered into a agreement with that

21   party to license the library of photos?

22       A.    Going forward?

23       Q.    Yes.

24       A.    Yes.

25       Q.    And do they have the same terms as the

Doug Fleurant
February 21, 2024

1            IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF MASSACHUSSETTS
2
                 CASE NO. 1:23-CV-11085-RGS
3

4   PREPARED FOOD PHOTOS, INC.
    f/k/a ADLIFE MARKETING &
5   COMMUNICATIONS CO., INC.,
            Plaintiff,
6
    v.
7
    WENEEDAVACATION.COM, LLC
8

9          Defendant.
    _____/
10

11

12

13
                    REMOTE DEPOSITION OF
14
                    DOUG FLEURANT
15
              VOLUME 1 (Pages 1 - 20)
16

17
                 February 21, 2024
18          11:03 a.m. - 11:22 a.m.

19
              LOCATION:  Remote via Zoom
20            Pawtucket, Rhode Island

21
          Reported by:  Bridgitt Myers,
22            Cert No. CDR-2895.

23

24
    Job No.:  350281
25

Doug Fleurant
February 21, 2024

Page 2

```
 1   APPEARANCES:
 2   On behalf of Prepared Food Photos, Inc. f/k/a Adlife
     Marketing & Communications Co., Inc. :
 3
 4       Copy Cat Legal, PLLC
         3111 North University Drive
         Suite 301
 5       Coral Springs, Florida 33065
 6       BY:  LAUREN HAUSMAN, ESQ.
         lauren@copycatlegal.com
 7
     On behalf of WeNeedaVacation.com, LLC:
 8
         Stearns Weaver Miller Weissler Alhadeff &
 9       Sitterson, P.A
         106 East College Avenue
10       Suite 700
         Tallahassee, Florida 32301
11
         BY:  ADRIENNE C, LOVE, ESQ.
12       alove@stearnsweaver.com
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1                   INDEX OF EXAMINATION
 2   EXAMINATION:                                    PAGE
 3   Testimony of DOUG FLEURANT
 4   Direct Examination by Ms. Love                   5
 5   Certificate of Oath                             17
     Certificate of Digital Reporter                 18
 6   Read and Sign Letter                            19
     Errata                                          20
 7
 8
 9           (Reporter's Note: No exhibits marked.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1   Proceedings began at 11:03 a.m.:
 2         THE REPORTER:  We are on the record.  Today is
 3   February 21st, 2024.  The time is 11:03 a.m. eastern
 4   standard time.  Good morning.  My name is Bridgitt
 5   Myers and I am the Michigan notary and reporter
 6   assigned by Lexitas.
 7         I request all parties stipulate and agree that
 8   by videoconference technology, this will be the
 9   remote deposition of Doug Fleurant in the case of
10   Prepared Food Photos, Inc., Adlife Marketing &
11   Communication Company, Inc.  v. WeNeedaVacation.com,
12   LLC.
13         Before going on the record, the witness
14   positively identified himself to me as Doug Fleurant
15   by Rhode Island driver's license issued by Rhode
16   Island DMV, and the witness is presently located in
17   Pawtucket, Rhode Island.
18         Counsel, will you please state your appearance
19   for the record, your firm, who you represent, and
20   that you agree to stipulate that I may place this
21   witness under oath and report this proceeding
22   remotely?
23         MS. LOVE:  Yes.  My name is Adrienne Love, with
24   the firm Stearns Weaver Miller, P.A..  I represent.
25   WeNeedaVacation, LLC, the defendant and yes, I agree
```

Page 5

```
 1   to the remote deposition.
 2         MS. HAUSMAN:  My name is Lauren Hausman from
 3   Copy Cat Legal.  We represent the plaintiff.
 4   Prepared Food Photos, and we stipulate to swearing
 5   in and being under oath, and the video recording.
 6         THE REPORTER:  Thank you.  Will the witness
 7   please raise your right hand?  Do you swear or
 8   affirm that the testimony you are about to give is
 9   the truth, the whole truth, and nothing but the
10   truth?
11         THE WITNESS:  Yes.
12   Thereupon:
13               DOUG FLEURANT,
14         having been first duly sworn, was examined and
15   testified as follows:
16         THE REPORTER:  Thank you, Counsel.  You may
17   proceed.
18         MS. LOVE:  Thank you.
19               DIRECT EXAMINATION
20   BY MS. LOVE:
21      Q.   Hi, Mr. Fleurant, my name is Adrienne Love, as
22   you heard.  I am here to take your, the limited
23   deposition on behalf of Prepared Food Photos, which I'll
24   refer to as PFP, throughout the deposition.  I don't
25   imagine that this will take much longer than 30 or 45
```

Doug Fleurant
February 21, 2024

Page 6

1  minutes.
2     A.   Okay.
3     Q.   Have you been deposed before?
4     A.   Yes, I have.
5     Q.   Are you familiar with the basic rules of a
6  deposition?
7     A.   Yes, I am.
8     Q.   Wonderful.  I won't go through all of them, but
9  if you do need a break at any time, even though it's a
10  short deposition, please let me know.  And if you don't
11  understand any of the questions, please feel free to let
12  me know if you'd like me to rephrase it.
13     A.   Okay.
14     Q.   We are here to talk about two topics on behalf
15  of PFP.  The first topic is PFP's financial decision and
16  or business plan to pursue or continue to pursue alleged
17  infringers.  Are you prepared to discuss that topic
18  today?
19     A.   Yes, I am.
20     Q.   And the second topic is any financial analysis
21  or discussion surrounding the profits or revenues made
22  from monthly subscriptions to PFP's library of photos
23  versus profits or revenues made from third parties for
24  settling alleged infringement of photos that PFP owns.
25  Are you prepared to talk about that topic today?

Page 7

1     A.   Yes, I am.
2     Q.   And for the first topic, what did you do to
3  prepare yourself to discuss the financial decision or
4  business plan to pursue or continue to pursue alleged
5  infringers?
6     A.   Well, I carefully read the topic and I had a
7  discussion with my attorney as to how best to
8  appropriately respond.
9     Q.   Did you talk to anyone within PFP regarding
10  their discussions or business plans or decisions to
11  pursue alleged infringers?
12     A.   No.
13     Q.   Do you know about the company's decision to do
14  that?  Are you familiar with why the company chose to
15  pursue alleged infringers?
16     A.   Yes, I am.
17     Q.   And based on my last deposition of PFP, we
18  learned that in 2016 was really the year that you began
19  to pursue infringers.  Is that fair to say?
20     A.   Yes.
21     Q.   And did PFP have any sort of business plan that
22  involved that IP enforcement?
23     A.   No.  There was no written plan in place.
24     Q.   Was there a general business plan amongst the
25  owners or operators of PFP?

Page 8

1     A.   No specific plan short of just trying to
2  protect our property.
3     Q.   Why did PFP decide to start to pursue
4  infringers?
5     A.   Revenues associated with licensing dropped
6  considerably and we realized it's because people were
7  stealing the images as opposed to licensing them.
8     Q.   Was there any analysis done on the profits that
9  could be earned for IP infringement or, sorry, for IP
10  enforcement?
11     A.   No, the goal was to just cease the, the illegal
12  use, the unauthorized use.
13     Q.   Did that goal change at any point in time?
14     A.   No.  To this day, our goal is to prevent the
15  unlicensed use and to try to increase the licensing.
16     Q.   And it's my understanding that PFP earns
17  approximately 120,000 from its licensing each year.  How
18  does it support its business without the IP enforcement
19  revenue?
20     A.   The costs -- the costs associated with the
21  licensing are minimal.  The library is in place, so the
22  only expense, basically, is the software required to run
23  the subscription service.
24     Q.   And so the rest of the employees that work for
25  PFP primarily run the IP enforcement section of the

Page 9

1  company?
2     A.   Manage or work for, yes.
3     Q.   And has there ever been any discussion
4  surrounding the financial benefits of pursuing
5  infringements?
6     A.   There is a financial benefit, but that was not
7  the point of any discussion.  Any discussion was to
8  prevent the unlicensed use, whatever we had to do to
9  protect our rights and cease that unlicensed use.
10     Q.   Has it ever been too expensive to pursue
11  infringers?
12     A.   We have not recognized that yet, no.
13     Q.   And so I'll move at that -- at this point to
14  topic two, which is regarding the profits or revenues
15  made from the monthly subscriptions versus the IP
16  enforcement revenues.  Have you had any discussions
17  regarding this topic, other than with your attorney,
18  within PFP?
19     A.   Could you restate the question, just to be sure
20  I understand it properly?
21     Q.   Sure.  I don't want to get into anything you
22  discussed with your attorney.  But to prepare for this
23  topic, did you have any discussions with anyone else in
24  PFP?
25     A.   No.  To prepare for this deposition, I did not.

Doug Fleurant
February 21, 2024

Page 10

1  I'm familiar with the operation firsthand.

2     Q.   And have there been any discussions regarding
3  the revenues made from profits or from licensing versus
4  from third party revenue over the years?

5     A.   Yes, we have had discussions about what each
6  one brings in.

7     Q.   And who have those discussions been with?

8     A.   It would be with myself and Joel El Brizio,
9  stockholder, owner.

10    Q.   And what did you discuss regarding those?
11 Regarding the licensing versus the enforcement revenues?

12    A.   Basically just what the actual numbers were at
13 the end of each quarter, end of each year.  And that the
14 goal of increasing licensing and preventing the
15 unlicensed use.

16    Q.   Did you have any goals for increasing the IP
17 enforcement revenues?

18    A.   We do not have any specific goals to increase
19 that.

20    Q.   Have you tracked the increase over the years
21 for the IP enforcement revenues?

22    A.   Specific tracking, no, just year end financial
23 statements will tell us what those numbers are.

24    Q.   And has that led to filing more lawsuits?

25    A.   No, not specifically.  Lawsuits being filed are

Page 11

1  a result of us locating unlicensed usage.  That, that
2  determines what becomes a lawsuit.

3     Q.   And so for the IP enforcement, are you looking
4  to maintain the same revenue from year-to-year?

5     A.   There are no specific plans with respect to
6  future enforcement.  Short of if we locate an unlicensed
7  use, we will put in a claim.  We do not dictate the, the
8  volume there.  The volume dictates what we can do.

9     Q.   When you make an estimate for the next year on
10 your revenues, do you anticipate a certain amount of
11 revenue from IP enforcement?

12    A.   No, we do not try to predict that revenue.

13    Q.   But doesn't that enforcement sustain your
14 business?  I mean, doesn't the revenue that you earn from
15 IP enforcement sustain the PFP's business?

16    A.   It's a contributing factor, yes.

17    Q.   A large one, right?

18    A.   It -- yes, it is -- it is a large one.  But we
19 have no control over what we're going to find for
20 unlicensed usage.

21    Q.   Right.  But you have control over how many
22 demand letters you send out and how many lawsuits you
23 file, correct?

24    A.   We do not.  We, we find -- we find sightings
25 where there's an unauthorized use, we send it to the

Page 12

1  attorney.  The attorney then will proceed with any claim.

2     Q.   But PFP testified that the decision to send out
3  a demand letter or file a lawsuit is a decision that's
4  made between the attorneys and PFP.  In other words, PFP
5  could say we don't want to pursue this particular
6  potential infringement?

7     A.   That is a possibility, but very seldom will it
8  happen.  If we send a claim to the attorney, we, unless
9  the attorney tells us it's not viable, we would expect
10 the attorney to file a claim.

11    Q.   And how much do you expect to recover in
12 settlement monies from each claim?  On average?

13    A.   We would say 60 percent of whatever that
14 settled amount is -- settlement amount is.  We allow the
15 attorney to negotiate that settlement.

16    Q.   And so based on PFP's last testimony, the
17 amount per infringement requested for one photo was
18 approximately $30,000.  So you would expect 60 percent of
19 that 30,000, correct?

20    A.   If -- I would say yes.  If we send out a claim
21 for 30,000 and it settles for that 30,000, we would
22 expect 60 percent of that, less any expenses.

23    Q.   And those expenses would be primarily
24 attorney's fees.

25    A.   Attorney's fees, yes.  And their expenses.

Page 13

1     Q.   And is that 60 percent based on the demand
2  letters that you send or would that 60 percent only be if
3  a lawsuit was filed?

4     A.   That 60 percent is based on any settlement,
5  whether that settlement has been negotiated prior to or,
6  or in court.

7     Q.   Is it fair to say the 30,000 demand goes up
8  equally for two photos?  So in other words, does the
9  30,000 go to 60,000 if it's two photos?

10    A.   I do not know specifically how the attorney
11 would file that claim based on the number of images.

12    Q.   That's fair.  And so from 2016, over the four
13 years of 2016 to 2020, is it fair to say that your IP
14 enforcement increased over those four years?

15    A.   Yes, as we became a little more efficient in
16 locating unlicensed usage, yes.

17    Q.   And would you say you're very efficient at
18 locating unlicensed usage now?

19    A.   We are not very efficient at this point.  I
20 would think maybe some kind of AI product would be a
21 little more efficient.  Right now, everything we do is
22 manual.

23         MS. LOVE:  I don't have any further questions.
24 Lauren, if you have cross, this is just limited, so
25 I don't want to go into anything else.

Doug Fleurant
February 21, 2024

---

Page 14

```
 1        MS. HAUSMAN:  I was just taking a few notes.
 2   If we can just do a quick five minute break.
 3        MS. LOVE:  Sure.
 4        MS. HAUSMAN:  And then I very likely I won't
 5   have anything.  Just want to make sure.
 6        MS. LOVE:  No problem.
 7        MS. HAUSMAN:  Doug, if we're going to take a
 8   quick five minute break, you can go on mute, run to
 9   the bathroom, get water, whatever you want to do.
10   It's normally how quick breaks work.
11        THE WITNESS:  That's fine.  I'll just -- I'll
12   just mute and wait for you all to come back and yell
13   at me.  Okay?
14        MS. HAUSMAN:  Thanks.
15        THE REPORTER:  We are off the record.  The time
16   is 11:18 a.m.
17        (Off the record.)
18        THE REPORTER:  We are on the record.  The time
19   is 11:22 a.m.
20        MS. HAUSMAN:  Thank you again for indulging in
21   the break.  I don't have anything on cross.
22        MS. LOVE:  Sounds good.  Mr. Fleurant, I really
23   appreciate your time today.
24        THE WITNESS:  Thank you.
25        THE REPORTER:  Will there be any orders today?
```

Page 15

```
 1        MS. LOVE:  Not at this time.
 2        MS. HAUSMAN:  No, not at this time from us
 3   either.
 4        THE REPORTER:  Thank you.
 5        MS. LOVE:  Thank you.
 6        THE REPORTER:  We are off the record.  The time
 7   is 11:22 a.m..  Everybody, have a great day.
 8        (Deposition concluded at 11:22 a.m.)
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 16

```
 1              CERTIFICATE OF OATH
 2
 3   STATE OF FLORIDA )
 4   COUNTY OF LEON   )
 5
 6        I, the undersigned authority, Bridgitt Myers, Remote
 7   Online Notary, certify that DOUG FLEURANT remotely
 8   appeared before me and was duly sworn on February 21,
 9   2024.
10        WITNESS my hand and official seal this 2nd day of
11   May 2024.
12
13              Bridgitt Myers
14
              _____
15            Bridgitt Myers, CDR-2895
              Michigan RON
              Expires: July 6, 2029
16
17
18
19
20
21
22
23
24
25
```

Page 17

```
 1          CERTIFICATE OF DIGITAL REPORTER
 2
 3        I, BRIDGITT MYERS, a Digital Reporter and Remote
 4   Online Notary within and for the State of Michigan, do
 5   hereby certify:
 6
 7        That the foregoing proceeding hereinbefore set forth
 8   was accurately captured with annotations by me during the
 9   proceeding.
10
11        I further certify that I am not related to any of
12   the parties to this action by blood or marriage, and that
13   I am in no way interested in the outcome of this matter.
14
15        IN WITNESS THEREOF, I have hereunto set my hand this
16   21st day of February, 2024.
17
18              Bridgitt Myers
19
              _____
20            Bridgitt Myers, CDR-2895
              Michigan RON
              Expires: July 6, 2029
21
22
23
24
25
```

Levy Second Affirmation
Exhibit L

From:   joel albrizio <XXX@bad-adz.com>
Sent:   Friday, May 3, 2024 1:04 AM
To:     Paul Levy
Cc:     XXX@lawacrossla.com; XXX@glllaw.com; Nick Sansone; Efrosini Cruz; Daniel
DeSouza
Subject:        Re: Attorney fees

Good Morning Paul,

Yesterday afternoon I was made aware of an issue you brought to Dan's attention. The issue of
statute of limitations regarding a client of yours.

Be it right or wrong a staff member on our team made an honest mistake. It's as simple as that.
The mistake that was made was brought to our attention and today our team is better informed
than the day before.

We understood a new URL for an image represented a new use and felt it was a legitimate
infringement.

I think everyone understands I enjoy the creative part of our business and not the legal aspect of
it. I am an artist who enjoys working with local supermarkets in telling each retailer's important
story.

However, companies and individuals dont license images as they once did.

We live in a world of copy and paste where our images show up in our clients' competition ads.
This is unacceptable to our clients when operating an exclusive image library for locally owned
supermarkets fighting for their lives with big box retailers throughout the United States.

It is difficult for me to understand how you feel an infringement requiring counsel representation
is worth only $750 when a knowledgeable business owner is caught stealing but a paperwork
error calls for a $32,000 resolution.

That said, bring your case for attorney fees before the court as you should if you feel you and
your team are justified. I believe in letting the court system set the standards we all live by.

Best, Joel

Joel M. Albrizio
President

C: (617) XXX-XXXX
XXX@bad-adz.com

Bad-Adz Inc.

38 Church Street
Pawtucket, RI 02860

www.bad-adz.com
Schedule a meeting with me!

Much of our business is built on referrals from clients like yourself who have been pleased with the services we've provided. If you know of another company that might benefit from the products and services we provide we would be grateful for a referral.

# Levy Second Affirmation Exhibit M

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 1:23-cv-00931-CNS-MDB

PREPARED FOOD PHOTOS, INC. f/k/a
ADLIFE MARKETING &
COMMUNICATIONS CO., INC.,

      Plaintiff,

v.

AM INC. d/b/a WING IT PLUS AT THE
CHAPEL HILLS MALL,

      Defendant.

---

## DECLARATION OF DANIEL DESOUZA

Daniel DeSouza does hereby declare pursuant to 28 U.S.C. § 1746:

1.     I submit this declaration in support of plaintiff Prepared Food Photos, Inc. f/k/a Adlife Marketing & Communications Co., Inc. and ("Plaintiff") Motion for Default Final Judgment against defendant AM Inc. d/b/a Wing It Plus at the Chapel Hills Mall ("Defendant"). This declaration and the facts stated herein are based upon my personal knowledge.

2.     I have been a member in good standing of the New York Bar since 2005, the District of Columbia Bar since 2005, and the Florida Bar since 2006. I am one of two principal partners of the law firm CopyCat Legal PLLC ("CopyCat Legal"), which has provided legal services to Plaintiff in this action throughout the pendency of this action.

3.     I am a 2004 graduate of the George Washington University Law School and am admitted to the Florida Bar, the New York Bar, and the D.C. Bar. I am likewise admitted to several federal courts throughout the country, including: (a) the United States Court of Appeals for the Eleventh Circuit; (b) the United States Court of Appeals for the Eighth Circuit; (c) the United

States Court of Appeals for the Tenth Circuit; (d) the United States District Court for the Southern District of Florida; (e) the United States District Court for the Middle District of Florida; (f) the United States District Court for the Northern District of Florida; (g) the United States District Court for the Southern District of Texas; (h) the United States District Court for the Eastern District of Texas; (i) the United States District Court for the Southern District of New York; (j) the United States District Court for the Eastern District of New York; (k) the United States District Court for the Northern District of New York; (l) the United States District Court for the Western District of Arkansas; (m) the United States District Court for the District of Nebraska; (n) the United States District Court for the District of New Mexico; (o) the United States District Court for the District of Colorado; (p) the United States District Court for the Eastern District of Michigan; (q) the United States District Court for the Western District of Michigan; (r) the United States District Court for the Northern District of Illinois; (s) the United States District Court for the District of Maryland; (t) the United States District Court for the Western District of Texas; (u) the United States District Court for the Eastern District of Missouri; (v) the United States District Court for the District of Columbia; and (w) the United States District Court for the Western District of Pennsylvania. I previously worked at Milbank, Tweed, Hadley & McCloy LLP (from 2004 – 2010) and Becker & Poliakoff, PA (from 2010 – 2014) before forming DeSouza Law, P.A. in 2014 and CopyCat Legal in 2019.

   4.      Since 2004, my practice has principally focused on business/complex commercial and intellectual property litigation. During that time, I have served as counsel of record in dozens of copyright infringement, trade secret, and trademark infringement lawsuits.  In total, I have served as counsel of record in approximately 250 federal civil and/or bankruptcy actions and 250+ state court lawsuits in Florida/New York.

5.      In addition to myself, a second-year associate (Meghan Medacier) also billed time on this matter. She is a 2021 graduate of The University of Florida Levin College of Law, where she served on law review. She previously worked at Cole, Scott & Kissane, P.A. prior to joining CopyCat Legal in 2023. She is admitted to the Florida Bar, the United States District Court for the Southern District of Florida, the United States District Court for the Middle District of Florida, and the United States District Court for the District of Colorado.

6.      Additionally, a paralegal (Denise Sosa) billed time on this matter. Denise Sosa has been a paralegal since 1995 and has worked at various law firms, working on matters that include commercial litigation, criminal defense, admiralty, and class action products liability litigation, while her primary focus and experience is in commercial litigation. She has over 20 years of experience in preparing for and attending hearings, arbitrations, and trials (both for federal and state court). She is bilingual, speaking both English and Spanish fluently.

7.      The purpose of this declaration is to memorialize the fees for legal services, costs, and expenses provided by CopyCat Legal in the above-captioned case through the present date.

8.      CopyCat Legal establishes standard hourly rates for services provided by its attorneys. These rates are within the range charged by other lawyers in South Florida and are fair and reasonable rates for this type of work.

9.      I am familiar with the services provided to Plaintiff in this action and the rates charged for such work.

10.     The attorneys and paralegals at CopyCat Legal record the time spent on matters contemporaneously on electronic billing software/time sheets. Each time entry includes the date the work is performed, the client and matter numbers, the time spent, and a brief description of the nature of the work performed.

11.     Through the present date, I expended 2.30 hours of attorney time in prosecuting this matter on Plaintiff's behalf, our associate attorney (Meghan Medacier) expended 6.25 hours of attorney time in prosecuting this matter on Plaintiff's behalf, and our paralegal (Denise Sosa) expended .50 hours of time in prosecuting this matter on Plaintiff's behalf. This includes the time spent to investigate the alleged infringement, drafting an initial notice letter to Defendant, drafting the Complaint in this matter, attempting service, drafting the Motion for Clerk's Default, drafting the Motion for Entry of Default Judgment, and drafting the exhibits/supporting declarations for such motion. All of these time entries are reflected in CopyCat Legal's billing records that are being provided in connection herewith as **Exhibit "1."**

12.     My billable rate for copyright/intellectual property matters at CopyCat Legal is $450.00 per hour, the rate for an associate attorney is $325.00 per hour; and the rate for paralegals is $125.00 per hour. This rate is within the range charged by other lawyers in Colorado with similar experience/background and is fair and reasonable for this type of work. See, e.g., Broad. Music, Inc. v. Cleatz Bar & Grill, LLC, No. 12-cv-00321-REB-CBS, 2013 U.S. Dist. LEXIS 26889, at *5 (D. Colo. Feb. 27, 2013) (finding that the hourly rates of $500 for a partner handling in the matter, $325 for the lead associate, and $160 for the paralegal, fall within the reasonable and acceptable range of rates charged by intellectual property attorneys of comparable skill, experience, and reputation for the performance of similar services in bringing copyright infringement claims.); Shrader v. Beann, Civil Action No. 10-cv-01881-REB-MJW, 2012 U.S. Dist. LEXIS 20575, at *7 (D. Colo. Feb. 17, 2012), ("With regard to the reasonableness of the rates, the court is familiar with the rates charged by attorneys in this area and concludes that a rate of $425 per hour for the senior attorneys, given their experience, skill, and specialization, is reasonable."); Barnett v. Bd. of Cty. Comm'rs of Montrose, No. 14-CV-1765-JAP-GPG, 2015 U.S. Dist. LEXIS 173770, at *15

(D. Colo. Dec. 14, 2015) (finding that a reasonable hourly rate for lead counsel is $400 per hour, $300 for attorneys with seven years of practice, $250 for an attorney with five years of practice, and $75 for paralegal work); Edwards v. Edwards, Civil Action No. 20-cv-02843-CMA-SKC, 2021 U.S. Dist. LEXIS 7060, at *4-5 (D. Colo. Jan. 14, 2021) (finding that the hourly rate of $400 per hour for Attorney Biscan and $180 per hour for paralegal Ilene Epstein is consistent with evidence of what the market commands for federal litigation in the District of Colorado for lawyers of comparable skill, experience, and reputation.) (citing Barnett v. Bd. of Cty. Commissioners of Cty. of Montrose, No. 14-CV-1765-JAP-GPG, 2015 U.S. Dist. LEXIS 173770, 2015 WL 13614118, at *5 (D. Colo. Dec. 14, 2015) (collecting cases that "suggest that the prevailing rates in Denver . . . for experienced litigators approach $400 per hour in recent years"), *report and recommendation adopted*, 2015 U.S. Dist. LEXIS 173768, 2015 WL 13614119 (D. Colo. Dec. 31, 2015)); (also citing Universal Drilling Co. v. Newpark Drilling Fluids, LLC, No. 08-CV-02686-MSK-CBS, 2011 U.S. Dist. LEXIS 17203, 2011 WL 715961, at *2 (D. Colo. Feb. 22, 2011) (noting Colorado Bar Association survey reported median billing rate of $400 per hour for partners in large firms)).

13.     Further, the hourly rates for both myself, associates, and for CopyCat Legal's paralegals have previously been found to be reasonable by multiple federal courts. See, e.g., Patriot Fine Foods, at pp. 11 – 12 ("In light of counsel's experience (*see id.* ¶¶ 2–5), and the prevailing market rates, and Defendant's failure to oppose the reasonableness of the rate, I find that the proposed hourly rate of $450 is reasonable based upon the facts and circumstances of this case, including Defendant's default."); Afford. Aerial Photography, Inc. v. Elegance Transp., Inc., No. 6:21-cv-1166-CEM-LHP, 2022 U.S. Dist. LEXIS 32586, at *29 (M.D. Fla. Feb. 23, 2022) (finding undersigned counsel's $450.00 hourly rate and CopyCat Legal's paralegal's $125.00

hourly rate to be reasonable in copyright infringement case); <u>Temurian v. Piccolo</u>, No. 18-CV-62737-SMITH/VALLE, 2021 U.S. Dist. LEXIS 63144, at *6 (S.D. Fla. Mar. 30, 2021) (in commercial litigation case, finding undersigned counsel's $400.00 hourly rate reasonable for work performed from 2018 – 2020).

14.     I am familiar with the lodestar method of determining the reasonableness of attorneys' fees. "The 'lodestar method' is the accepted analysis for determining a reasonable fee amount for a prevailing party in federal court." <u>Kerner v. City & Cty. of Denver</u>, 733 F. App'x 934, 936 (10th Cir. 2018); <u>See</u> <u>Gisbrecht v. Barnhart</u>, 535 U.S. 789, 801-02, 122 S. Ct. 1817, 152 L. Ed. 2d 996 (2002).   The above-described fees are reasonable for the services provided to Plaintiff.

15.     In addition, CopyCat Legal incurred $717.00 in actual costs on Plaintiff's behalf in connection with pursuing this lawsuit, all of which is properly taxable.   Invoices for such are attached hereto as **<u>Exhibit "1"</u>** and separately on Plaintiff's Bill of Costs.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: August 4, 2023                          /s/ Daniel DeSouza____
                                               Daniel DeSouza

# EXHIBIT "B"

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

Case No. 1:23-cv-08036-JLR

PREPARED FOOD PHOTOS, INC. f/k/a
ADLIFE MARKETING &
COMMUNICATIONS CO., INC.,

     Plaintiff,

v.

EAT FOOD DISTRIBUTORS, LLC d/b/a
EAT FOOD CSA,

     Defendant.

---

## DECLARATION OF DANIEL DESOUZA

Daniel DeSouza does hereby declare pursuant to 28 U.S.C. § 1746:

1.     I submit this declaration in support of plaintiff Prepared Food Photos, Inc. f/k/a Adlife Marketing & Communications Co., Inc.'s ("Plaintiff") Motion for Default Final Judgment against defendant Eat Food Distributors, LLC d/b/a Eat Food CSA ("Defendant"). This declaration and the facts stated herein are based upon my personal knowledge.

2.     On September 11, 2023, Plaintiff filed its Complaint in this action. The Complaint contains a single cause of action for copyright infringement against Defendant. See D.E. 1.

3.     On September 26, 2023, Defendant was served with a copy of the Summons and Complaint in this action. See D.E. 9. Defendant was served by personal service on Nancy Dougherty, an agent in the Office of the Secretary of State of the State of New York who was authorized to accept service on behalf of Defendant.

4.      Despite proper service being effectuated, Defendant never filed an Answer or responsive pleading.

5.      On October 18, 2023 (following expiration of Defendant's response deadline), Plaintiff filed its Request for Clerk's Certificate of Entry of Default. See D.E. 12.

6.      There is no substantive procedural history beyond service of the summons and complaint.

7.      There is only one defendant in the case, so the Court may appropriately order a default judgment on this issue of damages.

8.      An inquest into damages is unnecessary. "A damages hearing, while authorized by Rule 55(b)(2), is not mandatory. Together, Rule 55(b)(2) and relevant case law give district judges much discretion in determining when it is necessary and proper to hold an inquest on damages. As such, a hearing is unnecessary so long as (i) the Court has determined the proper rule for calculating damages, and (ii) the plaintiff's evidence establishes, with reasonable certainty, the basis for the damages specified in the default judgment[.]" See Trs. of the N.Y.C. Dist. Council of Carpenters Pension Fund v. B&L Moving & Installation, Inc., No. 16-CV-4734 (GBD) (JLC), 2017 U.S. Dist. LEXIS 157756, at *7 (S.D.N.Y. Sep. 26, 2017) (internal quotations omitted) (*relying on the following cases*: Trs. of Sheet Metal Workers' Int'l Ass'n Local Union No. 28 Benefit Funds v. Maximum Metal Mfrs., Inc., No. 14-CV-2890 (JLC), 2015 U.S. Dist. LEXIS 134669, at *4 (S.D.N.Y. Oct. 2, 2015); Cement & Concrete Workers Dist. Council Welfare Fund, Pension Fund, Annuity Fund, Educ. & Training Fund & Other Funds v. Metro Found. Contractors Inc., 699 F.3d 230, 234 (2d Cir. 2012) Tamarin v. Adam Caterers, Inc., 13 F.3d 51, 54 (2d Cir. 1993); TigerCandy Arts, Inc. v. Blairson Corp., No. 09-CV-6215 (GBD) (FM), 2012 U.S. Dist. LEXIS 35269, 2012

WL 760168, at *1 (S.D.N.Y. Feb. 23, 2012)). Here, Plaintiff has provided relevant law illustrating that a default judgment against the Defendant is proper. The Plaintiff's evidence establishing with certain certainty the basis for the damages specified in the default judgment (Plaintiff's licensing structure), and the Court can determine the proper rule for calculating damages.

9. I have been a member in good standing of the New York Bar since 2005 and the Florida Bar since 2006. I am one of two principal partners of the law firm CopyCat Legal PLLC ("CopyCat Legal"), which has provided legal services to Plaintiff in this action throughout the pendency of this action.

10. I am a 2004 graduate of the George Washington University Law School and am admitted to the Florida Bar, the New York Bar, and the District of Columbia Bar. I am likewise admitted to several federal courts throughout the country, including: (a) the United States Court of Appeals for the Eleventh Circuit; (b) the United States Court of Appeals for the Eighth Circuit; (c) the United States Court of Appeals for the Tenth Circuit; (d) the United States District Court for the Southern District of Florida; (e) the United States District Court for the Middle District of Florida; (f) the United States District Court for the Northern District of Florida; (g) the United States District Court for the Southern District of Texas; (h) the United States District Court for the Eastern District of Texas; (i) the United States District Court for the Southern District of New York; (j) the United States District Court for the Eastern District of New York; (k) the United States District Court for the Northern District of New York; (l) the United States District Court for the Western District of Arkansas; (m) the United States District Court for the District of Nebraska; (n) the United States District Court for the District of New Mexico; (o) the United States District Court for the District of Colorado; (p) the United States District Court for the Eastern District of Michigan; (q) the United States District Court for the Western District of Michigan; (r) the United

States District Court for the Northern District of Illinois; (s) the United States District Court for the District of Maryland; (t) the United States District Court for the Western District of Texas; (u) the United States District Court for the Eastern District of Missouri; (v) the United States District Court for the District of Columbia; (w) the United States District Court for the Western District of Pennsylvania; (x) the United States District Court for the Eastern District of Oklahoma; (y) the United States District Court for the Central District of Illinois. I previously worked at Milbank, Tweed, Hadley & McCloy LLP (from 2004 – 2010) and Becker & Poliakoff, PA (from 2010 – 2014) before forming DeSouza Law, P.A. in 2014 and CopyCat Legal in 2019.

11.     Since 2004, my practice has principally focused on business/complex commercial and intellectual property litigation.  During that time, I have served as counsel of record in dozens of copyright infringement, trade secret, and trademark infringement lawsuits.  In total, I have served as counsel of record in approximately 400 federal civil and/or bankruptcy actions and 250+ state court lawsuits in Florida/New York.

12.     In addition to myself, a first-year associate (Meghan Medacier) also billed time on this matter. She is a 2021 graduate of The University of Florida Levin College of Law, where she served on law review. She previously worked at Cole, Scott & Kissane, P.A. prior to joining CopyCat Legal in 2023. She is admitted to the Florida Bar, the United States District Court for the Southern District of Florida, the United States District Court for the Middle District of Florida, and the United States District Court for the District of Colorado.

13.     The purpose of this declaration is to memorialize the fees for legal services, costs, and expenses provided by CopyCat Legal in the above-captioned case through the present date.

14.     CopyCat Legal establishes standard hourly rates for services provided by its attorneys.  These rates are within the range charged by other lawyers in South Florida and are fair and reasonable rates for this type of work.

15.     I am familiar with the services provided to Plaintiff in this action and the rates charged for such work.

16.     The attorneys and paralegals at CopyCat Legal record the time spent on matters contemporaneously on electronic billing software/time sheets.  Each time entry includes the date the work is performed, the client and matter numbers, the time spent, and a brief description of the nature of the work performed.

17.     Through the present date, I expended 1.70 hours of attorney time in prosecuting this matter on Plaintiff's behalf and our associate attorney (Meghan Medacier) expended 5.90 hours of attorney time in prosecuting this matter on Plaintiff's behalf. This includes the time spent to investigate the alleged infringement, drafting an initial notice letter to Defendant, drafting the Complaint in this matter, attempting service, drafting the Motion for Clerk's Default, drafting the Motion for Entry of Default Judgment, and drafting the exhibits/supporting declarations for such motion. All of these time entries are reflected in CopyCat Legal's billing records that are being provided in connection herewith as **Exhibit "1."**

18.     My billable rate for copyright/intellectual property matters at CopyCat Legal is $450.00 per hour and the rate for an associate attorney is $325.00 per hour.  This rate is within the range constituting the "forum rate" generally applied by courts in the New York federal courts for attorneys of similar experience.  See Farrington v. Jewish Voice Inc., No. 21-CV-1575 (NGG) (AYS), 2022 U.S. Dist. LEXIS 21812, at *15 (E.D.N.Y. Feb. 7, 2022) ("In copyright cases, courts

in this district have approved rates between $350 and $500"); <u>Pyatt v. Raymond</u>, 2012 U.S. Dist. LEXIS 58879, at *16 (S.D.N.Y. Apr. 25, 2012) (collecting cases approving $400 to $650 hourly rates for partners in copyright and trademark cases); <u>Bass v. Diversity Inc. Media</u>, No. 19-cv-2261 (AJN), 2020 U.S. Dist. LEXIS 93318, at *14 (S.D.N.Y. May 28, 2020) ("A review of cases in this District and in the Eastern District of New York suggests that courts have approved associate rates of $350 and up to $500 for partners in copyright cases."); <u>Tetra Images, LLC v. Grahall Partners, LLC</u>, No. 19-CV-05250 (PMH), 2021 U.S. Dist. LEXIS 125809, at *10-11 (S.D.N.Y. July 6, 2021) (in copyright infringement case, finding $475.00 hourly rate for managing partner in Florida and $450.00 hourly rate for partner in New York office to be reasonable); <u>McLaughlin v. IDT Energy</u>, No. 14 CV 4107 (ENV)(RML), 2018 U.S. Dist. LEXIS 128347, at *51-53 (E.D.N.Y. July 30, 2018) (finding award of rates typical to the Eastern District and noted to be: "$550 for partners/equity owners with more than thirty years of experience, $500 for partners/equity owners with more than fifteen years of experience, $450 for partners/equity owners with more than ten years of experience, $400 for senior associates/associates with more than ten years of experience, $350 for senior associates/associates with six to nine years of experience, $300 for associates with three to five years of experience, $250 for associates with fewer than three years of experience"); <u>Schwartz v. United States DEA</u>, No. 13-CV-5004 (CBA) (ST), 2019 U.S. Dist. LEXIS 34165, at *26-27 (E.D.N.Y. Mar. 1, 2019) (awarding $500 hourly fee to partner litigating FOIA litigation, and listing awards of between $500 and $655 per hour for partners handling complex litigation); <u>Nat'l Envtl. Saf. Co. v. Katz</u>, No. 18-cv-02161 (JMA) (GRB), 2019 U.S. Dist. LEXIS 76044, at *5 (E.D.N.Y. May 6, 2019) (award based upon $500-$600 hourly rate to partners and $300 hourly rate for associates litigating breach of contract case).

19.     Further, the hourly rates for both myself and for CopyCat Legal's paralegals have previously been found to be reasonable by multiple federal courts. *See, e.g.*, Sadowski v. Orion Healthcare Servs., Inc., No. 21-24475-CV-WILLIAMS, 2023 U.S. Dist. LEXIS 47811, at *2 (S.D. Fla. Mar. 21, 2023) (rejecting report and recommendation that undersigned counsel be awarded fees at $385.00 per hour and instead finding that $450.00 per hour was reasonable rate for undersigned counsel); Markos v. The Big and Wild Outdoors LLC, No. 8:22-cv-1258-KKM-AEP, 2023 U.S. Dist. LEXIS 32023, at *25 (M.D. Fla. Feb. 24, 2023) (recommending that undersigned counsel be awarded $450.00 per hour as reasonable hourly rate) (report and recommendation adopted at 2023 U.S. Dist. LEXIS 43151); Sadowski v. Diverse New Media Corp, No. 22-61380-CIV, 2023 U.S. Dist. LEXIS 21791, at *20-21 (S.D. Fla. Jan. 13, 2023) ("The Court further finds that $450.00 is a reasonable hourly rate for Plaintiff's counsel (Daniel DeSouza), that $300.00 is a reasonable hourly rate for the junior associate attorney [Lauren Hausman], and that $125.00 is a reasonable hourly rate for the paralegal in this action given the complexity of the matter, the results obtained, and the experience of Plaintiffs' counsel which the Court found to be substantial."); Patriot Fine Foods, at pp. 11 – 12 ("In light of counsel's experience (*see id.* ¶¶ 2–5), and the prevailing market rates, and Defendant's failure to oppose the reasonableness of the rate, I find that the proposed hourly rate of $450 is reasonable based upon the facts and circumstances of this case, including Defendant's default."); Afford. Aerial Photography, Inc. v. Elegance Transp., Inc., No. 6:21-cv-1166-CEM-LHP, 2022 U.S. Dist. LEXIS 32586, at *29 (M.D. Fla. Feb. 23, 2022) (finding undersigned counsel's $450.00 hourly rate and Ms. Thomas' $125.00 hourly rate to be reasonable in copyright infringement case); Temurian v. Piccolo, No. 18-CV-62737-SMITH/VALLE, 2021 U.S. Dist. LEXIS 63144, at *6 (S.D. Fla. Mar. 30, 2021) (in commercial litigation case, finding undersigned counsel's $400.00 hourly rate reasonable for work performed

from 2018 – 2020). Additionally, the rate for CopyCat Legal's junior associate attorney has previously been found reasonable. See Harrington v Vintage Ways, No. 1:22-CV-0971-TWT (N.D. Ga.) ("The Court further finds . . . that $300.00 is a reasonable hourly rate for the junior associate attorney . . . given the complexity of the matter, the results obtained, and the experience of Plaintiffs' counsel which the Court found to be substantial.").

20.    Plaintiff is entitled to recover its reasonable attorneys' fees incurred in this action pursuant to 17 U.S.C. § 505. Plaintiff had incurred reasonable attorneys' fees in the amount of $2,682.50. True copies of CopyCat Legal's billing records, setting forth the time incurred on this matter, are annexed hereto as **Exhibit "1."**

21.    I am familiar with the lodestar method of determining the reasonableness of attorneys' fees.  The above-described fees are reasonable for the services provided to Plaintiff.

22.    In addition, CopyCat Legal incurred $601.75 in actual costs on Plaintiff's behalf in connection with pursuing this lawsuit, all of which is properly taxable. Invoices for such are attached hereto and separately on Plaintiff's Bill of Costs.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: January 5, 2024                    /s/ Daniel DeSouza____
                                           Daniel DeSouza

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

Case No. 1:22-cv-01270-LEK-ATB

PREPARED FOOD PHOTOS, INC. f/k/a
ADLIFE MARKETING &
COMMUNICATIONS CO., INC.,

      Plaintiff,

v.

WADAYANEED, LLC d/b/a
WHATDOYOUNEED.COM

      Defendant.

---

## DECLARATION OF DANIEL DESOUZA

Daniel DeSouza does hereby declare pursuant to 28 U.S.C. § 1746:

1.    I submit this declaration in support of plaintiff Prepared Food Photos, Inc. f/k/a Adlife Marketing & Communications Co., Inc.'s ("Plaintiff") Motion for Prevailing Party's Attorneys' Fees. This declaration and the facts stated herein are based upon my personal knowledge.

2.    I am counsel for the Plaintiff in this action. I supervised the other attorney, Christine Zaffarano, and the paralegal, Denise Sosa, working on this matter.

3.    I have been a member in good standing of the New York Bar since 2005 and the Florida Bar since 2006.  I am one of two principal shareholders of the law firm CopyCat Legal PLLC ("CopyCat Legal"), which has provided legal services to Plaintiff in this action throughout the pendency of this action.

4.    I am a 2004 graduate of the George Washington University Law School and am admitted to the Florida Bar, the New York Bar, and the District of Columbia Bar.  I am likewise

1

admitted to several federal courts throughout the country, including: (a) the United States Court of Appeals for the Eleventh Circuit; (b) the United States Court of Appeals for the Eighth Circuit; (c) the United States Court of Appeals for the Tenth Circuit; (d) the United States District Court for the Southern District of Florida; (e) the United States District Court for the Middle District of Florida; (f) the United States District Court for the Northern District of Florida; (g) the United States District Court for the Southern District of Texas; (h) the United States District Court for the Eastern District of Texas; (i) the United States District Court for the Southern District of New York; (j) the United States District Court for the Eastern District of New York; (k) the United States District Court for the Northern District of New York; (l) the United States District Court for the Western District of Arkansas; (m) the United States District Court for the District of Nebraska; (n) the United States District Court for the District of New Mexico; (o) the United States District Court for the District of Colorado; (p) the United States District Court for the Eastern District of Michigan; (q) the United States District Court for the Western District of Michigan; (r) the United States District Court for the Northern District of Illinois; (s) the United States District Court for the District of Maryland; (t) the United States District Court for the Western District of Texas; (u) the United States District Court for the Eastern District of Missouri; (v) the United States District Court for the District of Columbia; and (w) the United States District Court for the Western District of Pennsylvania. I previously worked at Milbank, Tweed, Hadley & McCloy LLP (from 2004 – 2010) and Becker & Poliakoff, PA (from 2010 – 2014) before forming DeSouza Law, P.A. in 2014 and CopyCat Legal in 2019.

5.     Since 2004, my practice has principally focused on business/complex commercial and intellectual property litigation.  During that time, I have served as counsel of record in dozens of copyright infringement, trade secret, and trademark infringement lawsuits.  In total, I have

served as counsel of record in approximately 400 federal civil and/or bankruptcy actions and 250+ state court lawsuits in Florida/New York.

6.     In addition to myself, an associate (Christine Zaffarano) also billed time on this matter. She is a 2014 Dean's List graduate of St. John's University School of Law. She attended on a full academic scholarship and served on Law Review. She was admitted to the New York Bar in 2015 and the Florida Bar in 2022. Christine is also admitted to the United States District Court for the Middle District of Florida, the United States District Court for the Southern District of Florida, the United States District Court for the Eastern District of New York, the United States District Court for the Northern District of New York, the United States District Court for the Southern District of New York, and the United States District Court for the Northern District of Illinois. She has practiced in civil courts for over eight years, including on behalf of the City of New York and the State of Florida.

7.     A paralegal (Denise Sosa) also billed time on this matter. Denise Sosa has been a paralegal since 1995 and has worked at various law firms, working on matters that include commercial litigation, criminal defense, admiralty, and class action products liability litigation, while her primary focus and experience is in commercial litigation. She has over 20 years of experience in preparing for and attending hearings, arbitrations, and trials (both for federal and state court). She is bilingual, speaking both English and Spanish fluently.

8.     The purpose of this declaration is to memorialize the fees for legal services, costs, and expenses provided by CopyCat Legal in the above-captioned case through the present date.

9.     CopyCat Legal establishes standard hourly rates for services provided by its attorneys. These rates are within the range charged by other lawyers in South Florida and are fair and reasonable rates for this type of work.

10.     I am familiar with the services provided to Plaintiff in this action and the rates charged for such work.

11.     The attorneys and paralegals at CopyCat Legal record the time spent on matters contemporaneously on electronic billing software/time sheets.  Each time entry includes the date the work is performed, the client and matter numbers, the time spent, and a brief description of the nature of the work performed.

12.     Through the present date, I expended 5.0 hours of attorney time in prosecuting this matter on Plaintiff's behalf, an associate attorney (Christine Zaffarano) expended 0.40 hours of attorney time in prosecuting this matter on Plaintiff's behalf, and a paralegal (Denise Sosa) expended 1.30 hours of time in prosecuting this matter on Plaintiff's behalf. This includes the time spent to investigate the alleged infringement and drafting an initial notice letter to WaDaYaNeed, LLC d/b/a Whatdoyouneed.com ("Defendant"), drafting the Complaint in this matter, attempting to contact the Defendant via e-mail, mail, and telephone, attempting service, drafting the Motion for Clerk's Default, drafting the Motion for Entry of Default Judgment and drafting the exhibits/supporting declarations for such motion, and drafting the Motion for Prevailing Party's Attorneys' Fees.  All of these time entries amount to a total of $1,897.50 and are reflected in CopyCat Legal's billing records that are being provided in connection herewith as **Exhibit "1."**

13.     My billable rate for copyright/intellectual property matters at CopyCat Legal is $450.00 per hour, and the rate for paralegals is $125.00 per hour. However, given that courts in this district typically find $250 - $350/hour to be reasonable for experienced counsel, for purposes of this case I will voluntarily reduce my rate to $325 per hour. See Adlife Mktg. & Communs. Co. v. Buckingham Bros., LLC, No. 5:19-CV-0796 (LEK/CFH), 2020 U.S. Dist. LEXIS 148755 (N.D.N.Y. Aug. 18, 2020) (quoting Golub Corp. v KLT Indus., Inc., No. 18-CV-1125, 2020 U.S.

Dist. LEXIS 105469, 2020 WL 3254133, at *4 (N.D.N.Y. June 16, 2020)) (internal citations omitted) ("According to the 'forum rule,' courts should employ 'the hourly rates . . . in the district in which the reviewing court sits in calculating the presumptively reasonable fee."); See Sadowski v. Roser Communications Network, Inc., No. 19-CV-592, 2020 U.S. Dist. LEXIS 10266, 2020 WL 360815, at *4 (N.D.N.Y. Jan. 22, 2020) ("Courts in this district have recently determined hourly rates between $250 and $350 for partners."); Broadcast Music, Inc. v DeJohn's on Lark, Inc., No. 19-CV 637, 2020 U.S. Dist. LEXIS 73262, 2020 WL 1986903, at *7 (N.D.N.Y. Apr. 27, 2020) ("hourly rates have ranged from $250 to $325 for partners of a firm"); Seidenfuss v. Diversified Adj. Services, Inc., No. 15-CV-1210, 2016 U.S. Dist. LEXIS 33559, 2016 WL 1047383, at *2 (N.D.N.Y. Mar. 15, 2016) ("Courts in this District consistently deem $300 to be an reasonable hourly rate for an experienced partner."); Pope v. County of Albany, No. 11-CV-736, 2015 U.S. Dist. LEXIS 123379, 2015 WL 5510944, at *10-11 (N.D.N.Y. Sept. 16, 2015) (finding $350 per hour for experienced counsel to be reasonable); Bosket v. NCO Fin. Sys., No. 3:11-CV-00678 (LEK/DEP), 2012 U.S. Dist. LEXIS 132239, at *9 (N.D.N.Y. Sep. 17, 2012) (concluding that $335 per hour requested for the partners was reasonable).

14.     Further, the hourly rates for both myself, associates, and for CopyCat Legal's paralegals have previously been found to be reasonable by multiple federal courts. See, e.g., Patriot Fine Foods, at pp. 11 – 12 ("In light of counsel's experience (see id. ¶¶ 2–5), and the prevailing market rates, and Defendant's failure to oppose the reasonableness of the rate, I find that the proposed hourly rate of $450 is reasonable based upon the facts and circumstances of this case, including Defendant's default."); Afford. Aerial Photography, Inc. v. Elegance Transp., Inc., No. 6:21-cv-1166-CEM-LHP, 2022 U.S. Dist. LEXIS 32586, at *29 (M.D. Fla. Feb. 23, 2022) (finding undersigned counsel's $450.00 hourly rate and CopyCat Legal's paralegal's $125.00

hourly rate to be reasonable in copyright infringement case); <u>Temurian v. Piccolo</u>, No. 18-CV-62737-SMITH/VALLE, 2021 U.S. Dist. LEXIS 63144, at *6 (S.D. Fla. Mar. 30, 2021) (in commercial litigation case, finding undersigned counsel's $400.00 hourly rate reasonable for work performed from 2018 – 2020).

15.     I am familiar with the lodestar method of determining the reasonableness of attorneys' fees.  The above-described fees are reasonable for the services provided to Plaintiff.

16.     In addition, CopyCat Legal incurred $516.88 in actual costs on Plaintiff's behalf in connection with pursuing this lawsuit, all of which is properly taxable.  Invoices for such are attached hereto as **Exhibit "1"** and separately on Plaintiff's Bill of Costs.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Dated: July 28, 2023                              /s/ Daniel DeSouza____
                                                  Daniel DeSouza

6

# Levy Second Affirmation Exhibit N



Copycat Legal PLLC
3111 N. University Drive
Suite 301
Coral Springs, FL 33065

T   877-HERO-CAT (877-437-6228)
E   help@copycatlegal.com

FRE 408 SETTLEMENT COMMUNICATIONS

November 10, 2022

**VIA FEDERAL EXPRESS AND ELECTRONIC MAIL** (jdeville@gmail.com):

Clyde's Chicken King, Inc.
Attn: John Clyde Deville, Jr.
17560 Highway 190
Port Barre, LA 70577

John's Chicken King, L.L.C.
Attn: John Clyde Deville, Jr.
219 East Prudhomme Street
Opelousas, LA 70570

**RE:**     *Prepared Food Photos, Inc. v. Clyde's Chicken King, Inc. d/b/a Chicken King and John's Chicken King, L.L.C. d/b/a Chicken King*

Dear Mr. Deville:

This law firm represents Prepared Food Photos, Inc. Our client is in the business of licensing high-end, professional photographs for the food industry. Through its website (www.preparedfoodphotos.com), our client offers a monthly subscription service which provides access to/license of tens of thousands of professional images. The rights associated with these images are exclusively owned by our client, and it has spent countless hours and substantial monies in building a business that relies on such exclusive subscription service. The unauthorized use of our client's work deprives our client of much-needed income and forces our client to incur substantial costs (monetary and time) in identifying violators and enforcing its rights.

In 2005, our client created a photograph titled "ChickenFried013" (the "Work"). A copy of the Work is exhibited below:



The Work was registered by our client with the Register of Copyrights on September 20, 2016 and was assigned Registration No. VA 2-017-741. A true and correct copy of the Certification of Registration pertaining to the Work is attached hereto as **Exhibit "A."**

To our knowledge, our client *did not* authorize you or your company to use and/or display the foregoing photograph. Notwithstanding this lack of authorization, our client has identified the subject photograph currently published by Chicken King for commercial purposes (http://chickenkingla.com/products.html):



A true and correct copy of the screenshot from Chicken King's website, displaying the copyrighted Work, is attached hereto as **Exhibit "B."**

If our client is mistaken or if you believe the photograph was previously licensed through our client or some other party, please contact us immediately with evidence of the prior licensing. If we do not hear from you *within fourteen (14) days from the date of this letter*, we will be forced to assume that the photograph was *not* properly licensed and will take appropriate legal action to enforce our client's rights.

If the above-described use of our client's photograph was not properly licensed, please understand that such unauthorized use may constitute federal copyright infringement under 17 U.S.C. § 501. In such event, I encourage you to discuss the foregoing with your attorney and/or your insurance carrier as copyright infringement is a serious matter that potentially exposes you to substantial damages/attorneys' fees if we are forced to file a lawsuit on behalf of our client. Keep in mind that attorneys' fees include those you will be forced to incur to mount a defense (if any) *and* potentially the attorneys' fees/costs we will incur to pursue the matter (which may be awarded) if our client prevails in court. It is important that you are cognizant of that exposure in deciding how to respond to this letter. Assuming our client prevails in court, 17 U.S.C. § 504(c)(1) provides our client the right to recover statutory damages (for *each work* that was infringed) "in a sum of not less than $750 or more than $30,000 as the court considers just." Further, if the infringement

was committed "willfully," the court may increase the award of statutory damages (for *each work* that was infringed) "to a sum of not more than $150,000."

Courts in the Eleventh Circuit (which covers Florida,[1] Georgia, and Alabama) have not hesitated (where appropriate) to impose substantial statutory damages against copyright infringers. See, e.g., Reiffer v. World Views LLC, No. 6:20-cv-786-RBD-GJK, 2021 U.S. Dist. LEXIS 38860, at *11 (M.D. Fla. Mar. 1, 2021) (awarding $45,000.00 where a *single* photograph of Dubai's cityscape was infringed); Corson v. Gregory Charles Interiors, LLC, No. 9:19-cv-81445, 2020 U.S. Dist. LEXIS 142932, at *14 (S.D. Fla. Aug. 7, 2020) (awarding $57,600.00 where a *single* photograph was infringed); CCA & B, LLC v. Toy, No. 1:19-CV-01851-JPB, 2020 U.S. Dist. LEXIS 248303, at *17 (N.D. Ga. Dec. 14, 2020) (awarding $30,000 for sale of counterfeit goods that infringed plaintiff's copyright). Please keep in mind both that the facts of these cases may be different than those here (thus militating in favor of a higher or lower award here) and that the above amounts do not account for attorneys' fees which are also recoverable under the Copyright Act.

Please note that Section 504 of the Copyright Act provides for the recovery of statutory damages (as explained above) or (at our client's election) actual damages plus "any additional profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages." Of course, if forced to litigate this matter, we will fully explore the damages issue and make an election that is most beneficial to our client.

While this is a serious matter, it is not particularly complex. The subject photograph(s) was either properly licensed or it was not. If it was, you should notify us immediately of such licensing so that we may inform our client of such. If it was not properly licensed, then the utilization of our client's work(s) without proper authorization constitutes copyright infringement. In that case, we will either resolve this issue in court (allowing a court to decide the matter) or privately between the parties. If the subject use was not authorized, our client hereby makes the following demand:

> *You shall pay Thirty Thousand Dollars ($30,000.00) within fourteen (14) days of the date first written above and shall immediately cease and desist from any further use of our client's work(s).*

Please contact us within the above-stated period to either provide evidence of licensing or to arrange for payment. If confirmation of a license or payment is received as described above, we will forego the filing of a lawsuit. Otherwise, please be aware that our client does not shy away from enforcing his rights in court. It has done so many times before and secured awards commensurate with the above examples. See, e.g. Prepared Food Photos, Inc. f/k/a Adlife

---

[1] Our client is a Florida corporation with its principal place of business in Florida. Our client viewed the subject photograph(s) in Florida and, if forced to file a lawsuit, would proceed by filing in the United States District Court for the Southern District of Florida. See, e.g., Vallejo v. Narcos Prods., LLC, No. 1:18-cv-23462-KMM, 2019 U.S. Dist. LEXIS 198109, at *5 (S.D. Fla. June 14, 2019) ("Copyright infringement is a tortious act, and the Florida long-arm statute confers jurisdiction if the effects of the infringement were felt in the state. Here, it is undisputed that Plaintiff is a resident of Florida, and as such the effects of any alleged copyright infringement would be felt in Florida."); Venus Fashion, Inc. v. Changchun Chengji Tech. Co., No. 16-61752-CIV-DIMITROULEAS/S, 2016 U.S. Dist. LEXIS 194263, at *6-7 (S.D. Fla. Nov. 2, 2016) ("In cases involving online intellectual property infringement, the posting of an infringing item on a website may cause injury and occur in Florida by virtue of the website's accessibility in Florida, regardless of where the offensive material was posted.") (collecting cases).

Marketing & Communications Co., Inc. v. Patriot Fine Foods LLC, Case No. 9:21-cv-92129-DMM (S.D. Fla. 3/22/2022) (awarding $26,001.00 where single photograph was infringed for a period of approximately four months); Prepared Food Photos, Inc. f/k/a Adlife Marketing & Communications Co., Inc. v. 193 Corp. d/b/a Bella Lukes, Case No. 1:22-cv-03832 (N.D. Ill. 9/21/2022) (awarding $36,491.00 where single photograph was infringed for a period of three years).

As stated above, the facts and circumstances of each case are different. However, you should know that "[s]tatutory damages serve the dual purposes of compensation and deterrence: they compensate the plaintiff for the infringement of its copyrights; and they deter future infringements by punishing the defendant for its actions." Broad. Music, Inc. v. George Moore Enters., Inc., 184 F. Supp. 3d 166, 171-72 (W.D. Pa. Apr. 25, 2016). To further the punitive/deterrent nature of statutory damages, courts generally award plaintiffs "statutory damages of *between three and five times the cost of the licensing fees* the defendant would have paid." See Broad. Music, Inc. v. Prana Hosp'y, Inc., 158 F. Supp. 3d 184, 199 (S.D.N.Y. 2016); see also Joe Hand Promotions, Inc. v. Alburl, No. 5:18-cv-1935-LCB, 2020 U.S. Dist. LEXIS 29309, at *16-17 (N.D. Ala. Feb. 20, 2020) ("Courts have generally upheld awards of three times the amount of the proper licensing fee as an appropriate sanction to ensure that the cost of violating the copyright laws is substantially greater than the cost of complying with them."); Broad. Music, Inc. v. N. Lights, Inc., 555 F. Supp. 2d 328, 332 (N.D.N.Y. 2008) ("[T]o put infringers on notice that it costs less to obey the copyright laws than to violate them, a statutory damage award should significantly exceed the amount of unpaid license fees. As such, courts often impose statutory damages in an amount more than double unpaid licensing fees where the infringement was not innocent.").

Using the above cases as a guide, please keep in mind that our client exclusively operates on a subscription basis. This means that access to one (1) photograph costs the same as access to the entire library of photographs. Our client makes its library available for $999.00 per month (https://preparedfoodphotos.com/featured-subscriptions/) with a minimum subscription of twelve (12) months https://preparedfoodphotos.com/terms.of.use.php. Thus, irrespective of how long you utilized the subject photograph, the *minimum* license fee that would have been owed is $11,988.00 ($999.00 x 12 months).

Consistent with the above legal authority, we believe a 3x multiplier (as punishment/deterrent effect) is appropriate, resulting in statutory damages of $35,964.00 (*for each annualized licensing period*). If your display of the aforementioned Work was for more than 1 year, then *each month* thereafter would increase our client's actual damages by $999.00 which, when trebled, would result in additional statutory damages of $2,997.00. (Note that the above does not take into account any award of costs or prevailing party attorneys' fees).

Further, you should provide a copy of this letter to your general liability insurance carrier (if one exists), notify them of our client's demand, disclose the identity of such insurer to us, and provide a copy of the subject insurance policy to us. If you believe we are mistaken as to the allegations of copyright infringement made herein, then we encourage you to provide us with copies of any license or other evidence supporting your authorized use of the subject work(s).

Finally, while removing the unlicensed photograph(s) from commercial display is required, please understand that *removal alone is insufficient to end this matter*. If your use of the subject

photograph is unauthorized, you must contact us to arrange and/or negotiate a payment for your past use.  Otherwise, a lawsuit *will* be filed and our client *will* pursue the above-described damages against you.

You should give this matter your immediate attention.

Very truly yours,

Daniel DeSouza, Esq.
For the Firm

Encl.

Levy Second Affirmation
Exhibit O

## BIOGRAPHICAL SKETCH -- PAULALAN LEVY

### Education

B.A., Reed College, 1973 (Phi Beta Kappa)
J.D., University of Chicago, 1976 (cum laude, Order of the Coif)

### Legal Employment

Law Clerk, Honorable Wade H. McCree, Jr., United States Court of Appeals for the Sixth Circuit (1976-1977)

Special Assistant, Solicitor General of the United States (1977)

Attorney, Public Citizen Litigation Group, specializing in rank-and-file labor law and free speech on the internet.  Argued scores of cases in United States Court of Appeals (three en banc).  Argued four cases in Supreme Court of the United States, wrote briefs for parties in several other cases (1977 to present)

Visiting Professor, Cardozo Law School (1983-1984)

### Other Activities

Board of Directors, Association for Union Democracy (1983 to present)

Chair, ABA Intellectual Property Section, Special Committee on Online Issues, Domain Name Subcommittee (2004 to 2007)

Chair, ABA Intellectual Property Section, Special Committee on Online Issues, Contextual Advertising Subcommittee (2007 to 2008)

Member, Legal Review Committee of the American Civil Liberties Union of the District of Columbia (2016 to present).

Member, Board of Directors, Bel Cantanti Opera (2022 to present)

Lecturer on labor, IP, and internet topics at legal, scholarly, bloggers and workers' conferences

### Publications

Co-author, Equality on the Job: A Working Person's Guide to Affirmative Action (1978, 1979)

Legal Responses to Rank-and-File Dissent: Restrictions on Union Officer Autonomy, 30 Buff. L. Rev. 663 (1982)

Electing Union Officers Under the LMRDA, 5 Cardozo L. Rev. 737 (1985)

The Unidimensional Perspective of the Reagan Labor Board, 16 Rutgers L.J. 269 (1986)

Union Members' Rights in Contract Ratification Referenda, 4 Hofstra Lab. L.J. 225 (1987)

State Regulation of Drug-Testing: Are Organized Workplaces Exempt?, 1988 U. Chi. Legal Forum 141

<u>Deferral and the Dissident</u>, 24 U. Mich. J. L. Reform 479 (1991)

<u>Deferral to the Intra-union Appellate Process: A Response</u>, 25 U. Mich. J. L. Ref. 907 (1992)

Editor, <u>Employee and Union Member Guide to Labor Law</u> (two-volume looseleaf, Clark-Boardman) (1984-1994)

<u>The Trademark Dilution Revision Act – A Consumer Perpective</u>, 16 Fordham Intellectual Property, Media and Entertainment Law Journal 1189 (2006)

<u>Litigating Civil Subpoenas to Identify Anonymous Internet Speakers</u>, 37 Litigation No. 3 (Spring 2011)

<u>Developments in <i>Dendrite</i></u>, 14 Fla. Coastal L. Rev. 1 (2012)

Supreme Court Cases:

Wrote briefs and argued:

<u>Sims v. CIA</u> (Freedom of Information Act)

<u>West v. Conrail</u> (statute of limitations in DFR case)

<u>Lingle v. Norge</u> (preemption of retaliatory discharge claims)

<u>Masters, Mates & Pilots v. Brown</u> (right to mailing lists in union election)


Lead or sole author of party's briefs, argued by counsel handling case below:

<u>DelCostello v. Teamsters</u> (reply brief only: statute of limitations in DFR case)

<u>Sheet Metal Workers v. Lynn</u> (removal of elected union officer)

<u>Wooddell v. IBEW</u> (right to jury trial in LMRDA case; right to sue under union constitution)

<u>North Star Steel v. Thomas</u> (statute of limitations in WARN case) (lost coin flip for oral argument with counsel in companion case)

<u>Caterpillar v. Lewis</u> (procedures for appealing removal decisions)

<u>O'Connor v. Consolidated Coin Caterers Corp.</u> (ADEA suit where rival hire is over 40)

<u>Rivet v. Regions Bank</u> (reply brief only: removability based on defense of res judicata)

Paul Alan Levy is an attorney with the Public Citizen Litigation Group, a public interest law firm that is a division of the consumer advocacy organization Public Citizen. Among the issues on which the group litigates are federal health and safety regulation, consumer litigation, open government, union democracy, separation of powers, and the First Amendment. PCLG litigates cases at all levels of the federal and state judiciaries and has a substantial practice before federal regulatory agencies.

After working as a law clerk to Honorable Wade H. McCree, Jr. (United States Court of Appeals, Sixth Circuit) and Special Assistant to Solicitor General McCree, Paul joined the Litigation Group in December 1977 to represent workers in rank-and-file labor law cases, largely representing dissident union members in cases involving union governance. He has been there ever since, with the exception of a one-year sabbatical when he taught at Cardozo Law School.   Over the years, he also developed subspecialties in some arcane issues of federal procedure such as removal jurisdiction, and the representation of "lawyers in trouble" from sanctions, contempt findings and the like (these days, though, as a defense lawyer, he files sanctions motions). He also pioneered Public Citizen's work on federal preemption of state law claims and objecting to collusive class action settlements.

He has argued scores of cases in United States Court of Appeals (three en banc). Moreover, he has argued four cases in Supreme Court of the United States, as well as writing briefs for parties in seven other cases.  One odd aspect of his Supreme Court practice is that each of these eleven cases was decided 9-0 – win or lose.

Paul has specialized more recently in free speech issues arising on the Internet. He has litigated cases in state and federal courts throughout the country about the identification of anonymous Internet speakers.  His amicus curiae brief in *Dendrite v. Doe*, whose approach was adopted by New Jersey's Superior Court Appellate Division, has become the model for other cases.  His Internet practice also includes the defense of trademark and copyright claims brought as a means of suppressing critical web sites.  His cases in this area, such as *Bosley Medical v. Kremer* and *Lamparello v. Falwell*, have established the right to create internet "gripe" sites that include the trademark names of companies in their domain names and meta tags. In *Smith v. Wal-Mart Stores* and *McCall v. National Security Agency*, he defended the rights of parodists to make fun of Wal-Mart's trademarks and the seals of the NSA and Department of Homeland Security.  In arguing against the issuance of prior restraints in *Bank Julius Baer v. Wikileaks*, he had the key insight that the case had been filed without subject matter jurisdiction.   For several years, Paul chaired subcommittees (on domain name litigation or on keyword advertising) of the American Bar Association's Intellectual Property Section. He currently serves on the Legal Review Committee of the American Civil Liberties Union of the District of Columbia.

A description of his work in this area was published in the Washingtonian Magazine as "Paul Levy, the Web Bully's Worst Enemy."    It is accessible at http://www.washingtonian.com/articles/people/paul-levy-the-web-bullys-worst-enemy/.   His work was also recently described in Hill, Stars and Gripes: Legal challenges over online reviews seek to separate fact from fiction, ABA Journal (July 2016), available at http://www.abajournal.com/magazine/article/legal_challenges _over_online_reviews_seek_to_separate_fact_from_fiction.

Levy Second Affirmation
Exhibit P

**PUBLIC CITIZEN LITIGATION GROUP**
1600 20th Street NW • Washington DC 20009
202.588.1000 • www.citizen.org

## Time Records Report

| Staff | Date | Time | Description |
|---|---|---|---|

### Prepared Food Photos v Clydes Chicken King

Levy, Paul

| | Date | Time | Description |
|---|---|---|---|
| | 3/27/2024 | 0.9 | Locate local counsel |
| | 3/27/2024 | 0.6 | Discuss case w/D |
| | 3/28/2024 | 0.7 | Source investigation |
| | 3/29/2024 | 1.2 | Fact and law resch for MtD |
| | 3/31/2024 | 0.7 | Resch for MtD and MSJ |
| | 4/3/2024 | 2.3 | Draft affidavits |
| | 4/4/2024 | 2.7 | Draft affidavits, SMF |
| | 4/4/2024 | 1.4 | Legal resch for MtD and SJ mem |
| | 4/5/2024 | 2.7 | Draft SJ Mem, resch; edit SMF, aff |
| | 4/7/2024 | 1.7 | Draft SJ Mem |
| | 4/8/2024 | 4.3 | Draft SJ Mem |
| | 4/8/2024 | 0.9 | Edit SJ mem, resch |
| | 4/9/2024 | 0.6 | Talk to cli, email to W about license |
| | 4/9/2024 | 3.8 | Edit SJ mem, affidavits, SMF |
| | 4/10/2024 | 0.7 | Discuss case w/W, cli |
| | 4/10/2024 | 3.9 | Edit SJ Mem and supporting papers |
| | 4/11/2024 | 4.5 | Rvw HC edits, discuss.  Finalize papers for filing |
| | 4/12/2024 | 1.4 | Cite check, rvw proofread |
| | 4/15/2024 | 0.1 | Rvw DeSouza email, consult coun, respond |
| | 4/16/2024 | 0.9 | Resch fees cases |
| | 4/16/2024 | 0.8 | Discuss prevailing party and Buckhannon w.MK, resch |
| | 4/17/2024 | 0.8 | Rates resch |
| | 4/18/2024 | 0.1 | Rvw stip, check resch, discuss coun, edit |
| | 4/19/2024 | 2.2 | Attorney fee demand letter |
| | 4/19/2024 | 0.8 | Edit fee ltr, resch |
| | 4/22/2024 | 0.2 | Finalize fee demand letter |
| | 4/24/2024 | 0.2 | Correspond re image acquisition; rvw evid |
| | 4/25/2024 | 0.1 | Finalizing stip and order |

| | | | |
|---|---|---|---|
| 5/2/2024 | 0.3 | Review proof, final edit of fee demand; note to coun re deadline |
| 5/2/2024 | 0.7 | Rvw and react to DeSouza email |
| 5/3/2024 | 0.6 | Fee settlement discussions w/AZ and DS |
| 5/3/2024 | 1.1 | Rates resch WL and CL |
| 5/9/2024 | 0.7 | Draft fee mem |
| 5/9/2024 | 2.1 | Draft fee memo, draft aff for W |
| 5/10/2024 | 0.3 | Discuss facts w SB, draft aff |
| 5/10/2024 | 4.5 | Draft Statement for fee mem |
| 5/11/2024 | 1.2 | Draft fee mem |
| 5/12/2024 | 1.3 | Draft fee mem |
| 5/13/2024 | 1.9 | Draft Levy Fee Aff, edit fee mem |
| 5/13/2024 | 4.2 | Draft fee mem |
| 5/14/2024 | 3.7 | Edit fee mem and Levy Second Aff; discuss SB aff w/SB and revise draft; discuss draft w/HC; rvw AZ edits and edit mem |
| **Staff total:** | **63.8** | |

**Sansone, Nick**

| | | | |
|---|---|---|---|
| 4/3/2024 | 0.2 | Reviewing draft affidavit from client |
| 4/4/2024 | 0.2 | Reviewing draft affidavit of P. Levy |
| 4/9/2024 | 1.1 | Reviewing draft motion to dismiss or for SJ |
| 4/22/2024 | 0.2 | Reviewing draft letter requesting attorney's fees |
| 5/14/2024 | 1.1 | Reviewing and commenting on draft fee motion |
| **Staff total:** | **2.8** | |
| **Case total:** | **66.6** | |
| **Grand total** | **66.6** | |